HOLLOWAY SAND & GRAVEL COMPANY, INC v DEPARTMENT
OF TREASURY

Docket No. 85356. Submitted March 12, 1986, at Lansing. Decided
July 7, 1986.

The Department of Treasury issued a corporate income tax
liability assessment of $68,640.15, plus $11,953.54 interest,
against Holloway Sand & Gravel Company, Inc., for the taxable
years ending June 30, 1972, and June 30, 1973. Holloway
contested the assessment, contending that a Texas speedway
operation and its Michigan sand and gravel operations consti-
tuted a unitary business for purposes of the Michigan corporate
income tax and that their incomes may not be subjected to the
separate accounting method utilized by the Department of
Treasury. The Department of Treasury, on the other hand,
contended that the sand and gravel operations and the speed-
way operations were separate and distinct businesses and that
the apportionment formula employed by Holloway could not be
used to enable Holloway to offset losses from its Texas activity
against Michigan source income. Holloway petitioned for re-
view of the Treasury Department's decision. The Tax Tribunal
upheld the deficiency assessment on grounds that Holloway's
Texas speedway and Michigan sand and gravel operations were
separate and distinct and apportionment formulas, therefore,
had no application. Holloway appealed. *Held:*

1. Apportionment formulas may only be applied where the
taxpayer's activities within the taxing state are integral seg-
ments of an interstate unitary business. A Tax Tribunal hear-
ing officer determined that the minimum contact or nexus
required to support apportionment taxation was lacking, and
the methodology employed by the hearing officer was autho-
rized by law. All of the officer's findings of fact were supported
by substantial evidence and the evidence so adduced supported
the ultimate conclusion that Holloway's Michigan and Texas
businesses were not unitary. The Texas speedway's losses for

REFERENCES

Am Jur 2d, State and Local Taxation §§ 456, 457, 577.

Comment Note.—Validity, under Federal Constitution, of state tax
on, or measured by, income of foreign corportion. 67 ALR2d 1322.

1972 and 1973 should be treated as nonbusiness income for purposes of the allocation and apportionment provisions of the Income Tax Act of 1967 and excluded from Holloway's Michigan taxable income.

2. The fact that there was a delay of approximately seven years in the tribunal's rendering of a decision in this matter does not require reversal since Holloway has failed to show that it has been prejudiced thereby, but Holloway is entitled to an abatement of interest beginning October 20, 1978, the delay thereafter being attributable to the Tax Tribunal.

Judgment affirmed. Interest on the judgment is abated commencing October 20, 1978.

1. TAXATION — INCOME TAX — APPORTIONMENT — BURDEN OF PROOF.

The commissioner of revenue may require a separate accounting or any other method to effectuate an equitable allocation of a taxpayer's taxable income; where a separate or different method of accounting is demanded, the burden of proof is on the state to show that the statutorily preferred formula is inadequate to determine the taxpayer's extent of business activity in Michigan (MCL 206.115, 206.195; MSA 7.557[1115], 7.557[1195]).

2. TAXATION — INCOME TAX — APPORTIONMENT — UNITARY BUSINESSES.

Apportionment formulas for determining a Michigan taxpayer's income for taxation purposes may only be applied where the taxpayer's activities within Michigan are integral segments of an interstate unitary business; in the absence of an underlying unitary business, apportionment of the taxpayer's multi-state business income is precluded.

3. APPEAL — ADMINISTRATIVE LAW — SUBSTANTIAL EVIDENCE.

Appellate review of an administrative body's action is limited to determining whether the action is supported by law and whether the factual findings are supported by competent, material, and substantial evidence on the whole record; substantial evidence must be more than a scintilla of evidence, although it may be substantially less than the preponderance of evidence necessary for most civil cases.

4. TAXATION — APPEAL — STATE BOARD OF TAX APPEALS — BURDEN OF PROOF.

The burden of proof in an appeal from an assessment, decision or order of the State Board of Tax Appeals is on the appellant (MCL 205.7; MSA 7.657[7]).

5. TAXATION — INCOME TAX — MULTI-STATE BUSINESSES — APPOR-
   TIONMENT.

   Factors to be considered in determining whether the operations
   of a multi-state business are unitary or separate and distinct
   for purposes of application of apportionment formulas for in-
   come taxation include: (1) economic realities of the business
   operations; (2) functional integration of the business operations;
   (3) whether there is centralized management; (4) economies of
   scale; and (5) whether substantial mutual interdependence
   exists between the operations.

6. TAXATION — INCOME TAX — MULTI-STATE BUSINESSES — APPOR-
   TIONMENT.

   There must be some sharing or exchange of value not capable of
   precise identification or measurement—beyond the mere flow of
   funds arising out of a passive investment or a distinct business
   operation—which renders formula apportionment a reasonable
   method of taxation in order to find a business activitiy a
   unitary business eligible for apportionment of income for taxa-
   tion purposes.

7. TAXATION — TAX TRIBUNAL — DELAY.

   A taxpayer seeking reversal of a decision by the Tax Tribunal
   because of substantial delay between the date of hearing by the
   tribunal and the date of the decision must show actual preju-
   dice in order to justify reversal.

8. TAXATION — TAX TRIBUNAL — DELAY — ABATEMENT OF INTEREST.

   Interest on a tax assessment upheld by the Tax Tribunal may be
   abated where a lengthy delay in the rendering of the tribunal's
   decision is not attributable to the taxpayer.

*Maurice Reisman,* for petitioner.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Richard R. Roesch* and *Terry P. Gomoll,* Assistant Attorneys General, for respondent.

Before: MacKenzie, P.J., and Allen and G. W. Crockett III,* JJ.

---

* Recorder's court judge, sitting on the Court of Appeals by assign-
ment.

ALLEN, J. Petitioner appeals as of right from a May 21, 1985, judgment of the Michigan Tax Tribunal sustaining a corporate income tax liability assessment of $68,640.15, plus $11,953.54 interest, for a total of $80,593.69 for the taxable years ending June 30, 1972, and June 30, 1973.[1]

The principal issue in this case is whether petitioner's Texas speedway operation and its sand and gravel operations constitute a unitary business for purposes of the Michigan corporate income tax. Petitioner contends that its sand and gravel business is dependent upon or at least contributory to the speedway business. The Department of Treasury (treasury) contends that the aggregate and raceway operations are "separate and distinct" businesses to which "there is neither operational nor economic unity." If treasury is correct in its position, the three-factor apportionment formula employed by petitioner cannot be used to enable petitioner to offset losses from its Texas activity against Michigan source income. On the other hand, if the two operations are unitary in nature, their incomes may not be subjected to the separate accounting method demanded by treasury. Though the facts hereinafter set forth are not substantially disputed, the legal conclusions drawn therefrom are.

Charles McGee, general manager for petitioner's sand and gravel enterprise and secretary for the

---

[1] The deficiency assessment was first issued by respondent, Department of Treasury, on December 30, 1975. In January 1986, petitioner appealed for review to the State Board of Tax Appeals (SBTA). In June, 1978, the SBTA conducted an evidentiary hearing. On October 1, 1982, the case was transferred to the newly formed Michigan Tax Tribunal for decision. On February 6, 1985, the hearing officer entered a proposed judgment upholding the deficiency assessment on grounds that petitioner's Texas speedway and Michigan sand and gravel operations were separate and distinct and that apportionment formulas, therefore, had no application. On May 21, 1985, the Tax Tribunal adopted the proposed judgment as the final decision of the tribunal.

taxpayer, testified that petitioner was principally engaged in two types of business activities: (1) the production and sale of sand and gravel aggregates in Michigan and out-of-state areas and (2) construction projects, such as earth filled dams, underground sanitary sewers, and race track construction in Michigan and in Colorado, Pennsylvania, Texas and Kentucky. At times, construction projects were acquired as a joint venture with one of petitioner's two affiliated companies, Holloway Sand & Gravel and Holloway Construction. Field offices were maintained at the job sites; the administrative offices were in Wixom, Michigan.

Petitioner is eighty percent owned by its president, Dan Holloway, and twenty percent owned by McGee. Dan Holloway, Jr., was petitioner's vice-president. Wixom was the headquarters for all permanent employees, including project engineers and estimators. The majority of foremen and superintendents were hired in Wixom and then sent to the various job sites. All administrative, executive, and financial decisions were directed from the Wixom office. The president negotiated and approved equipment purchase decisions. Payroll checks for the construction crews were approved in Wixom and sent by air mail to the job sites. The board of directors convened at the Wixom location.

Petitioner was the principal contractor for the "Texas World Speedway." Construction work commenced in or about 1969. Petitioner performed the asphalt work for the speedway and supervised subcontractors building the stands. Petitioner was paid in full for all effort under the construction contract except for the last estimate, dated January 9, 1970, which showed an unpaid balance of $385,506.41.

Petitioner was unable to collect the balance due because the company which contracted with peti-

tioner for the construction went bankrupt. Petitioner had a second lien on the speedway and purchased the speedway to protect its interest. Petitioner's objective was to eventually sell the speedway. In order to demonstrate to potential buyers that the speedway was a going concern and to establish a market value, petitioner decided to operate the speedway. The adjacent vacant land was sold at a profit.

Dan Holloway, Jr., vice-president, appointed to oversee operations of the speedway, died prior to the evidentiary hearing. Purchasing decisions were approved and payroll checks were signed at the Wixom office. A certified public accountant in Michigan took care of the majority of the speedway's financial reporting requirements, including corporate franchise tax returns and federal payroll tax returns.

During the course of the speedway's two-year operation, two racetrack managers were employed. The first manager was discharged in 1971. During his employment, a certified public accountant from Texas was apparently involved in the speedway's payroll matters. William Marvel was the second racetrack manager. A limited checking account in Texas was established for day-to-day expenditures in connection with the racetrack.

Eight races were held between the time the speedway was acquired in late 1971 and the time it closed in October, 1973. Between races, employees maintained and safeguarded the racetrack. Dan Holloway, Jr., attended every race. He personally handled advertising promotions. Petitioner utilized the speedway as publicity for its construction business. The speedway's losses in 1972 and 1973 were partially attributed to rainy weather conditions on the dates of seven of the eight races held. The speedway was sold approximately two

years prior to the evidentiary hearing in 1978 before the SBTA.

I

Was the Texas speedway business unitary with the Michigan sand and gravel business? We begin our analysis of this issue by rejecting petitioner's claim that the primary issue is whether the formulary apportionment method set forth in MCL 206.115; MSA 7.557(1115) and admittedly employed by petitioner in filing its income taxes fairly represented the business activities of petitioner in Michigan. Petitioner claims that the statutory formula method used by it fairly represented its business activities in Texas and Michigan and that treasury erred in forcing upon it a separate accounting method as allowed under § 195 of 1967 PA 281. Under § 195, the commissioner of revenue may require a separate accounting or any other method to effectuate an equitable allocation of a taxpayer's taxable income. MCL 206.195; MSA 7.557(1195); *Clarke-Gravely Corp v Dep't of Treasury,* 412 Mich 484, 488; 315 NW2d 517 (1982); *Jones & Laughlin Steel Corp v Dep't of Treasury,* 145 Mich App 405; 377 NW2d 397 (1985). Where a separate or different method of accounting is demanded, the burden of proof is on the state to show that the statutorily preferred formula is inadequate to determine the taxpayer's extent of business activity in Michigan. *Payne & Dolan of Wisconsin, Inc v Dep't of Treasury,* 138 Mich App 418; 360 NW2d 208 (1984).

However, as was so clearly pointed out in the comprehensive opinion of the hearing officer, apportionment formulas may only be applied where the taxpayer's activities within the taxing state are integral segments of an interstate unitary

business. Rudolph, *State Taxation of Interstate Business: The Unitary Business Concept and Affiliated Corporate Groups,* 25 Tax L Rev 171, 192 (1970). It is only where the Michigan business activities of the taxpayer are unitary with the taxpayer's activities outside of Michigan that the apportionment formula is applicable. *Mobil Oil Corp v Comm'r of Taxes of Vermont,* 445 US 425, 440; 100 S Ct 1223; 63 L Ed 2d 510 (1980); *F W Woolworth Co v Taxation & Revenue Dep't of New Mexico,* 458 US 354, 372; 102 S Ct 3128; 73 L Ed 2d 819 (1982). Simply stated, in the absence of an underlying unitary business, apportionment of a taxpayer's multi-state business income is precluded. As noted earlier, the hearing officer, and in turn the Tax Tribunal, concluded that the Texas operations were not unitary with the Michigan operations.

Accordingly, the issue before us is whether the Tax Tribunal's decision is proper. Appellate review of an administrative body's action is limited to determining whether the action is supported by law and whether the factual findings are supported by competent, material, and substantial evidence on the whole record. *MCI Telecommunications Corp v Dep't of Treasury,* 136 Mich App 28; 355 NW2d 627 (1984), lv den 422 Mich 883 (1985); *Master Craft Engineering, Inc v Dep't of Treasury,* 141 Mich App 56, 68; 366 NW2d 235 (1985). "Substantial evidence" must be more than a scintilla of evidence, although it may be substantially less than the preponderance of evidence necessary for most civil cases. *Holy Spirit Ass'n for the Unification of World Christianity v Dep't of Treasury,* 131 Mich App 743; 347 NW2d 707 (1984). The burden of proof in an appeal from an assessment, decision or order of the SBTA is on the

appellant. MCL 205.7; MSA 7.657(7).[2] Here, petitioner was the appellant.

The hearing officer determined that the minimum contact or nexus required to support apportioned taxation was lacking in the instant case. In reaching this conclusion the hearing officer identified five factors: (1) economic realities; (2) functional integration; (3) centralized management; (4) economies of scale, and (5) substantial mutual interdependence. These factors were not selected arbitrarily by the hearing officer. Rather, they are the guideposts developed by the United States Supreme Court for determining whether a multistate business is unitary or discrete. *Mobil Oil Corp, supra* ("economic realities"); *Exxon Corp v Wisconsin Dep't of Revenue,* 447 US 207; 100 S Ct 2109; 65 L Ed 2d 66 (1980), and *F W Woolworth v Taxation & Revenue Dep't of New Mexico,* 458 US 354; 102 S Ct 3128; 73 L Ed 2d 819 (1982) (functional integration, centralized management, "economies of scale"); *Container Corp of America v Franchise Tax Board,* 463 US 159; 103 S Ct 2933; 77 L Ed 2d 545 (1983), and *ASARCO Inc v Idaho State Tax Comm,* 458 US 307; 102 S Ct 3103; 73 L Ed 2d 787 (1982) ("substantial mutual interdependence"). Clearly, the methodology used by the hearing officer in arriving at a decision was authorized by law. The more delicate question is whether the findings of fact regarding each of the five factors were supported by substantial evidence and whether the evidence so adduced supported the ultimate conclusion that petitioner's Texas business was not unitary with its Michigan operations.

---

[2] Repealed by 1980 PA 162, § 3, effective September 30, 1982, which was after the hearing in this case, conducted by the State Board of Tax Appeals on June 29, 1978. Although transferred to the Tax Tribunal for ultimate decision, the burden of proof remains with the taxpayer.

The first factor is to identify the "economic realities" of the two businesses in question. As explained in *Mobil Oil, supra,* it is the underlying activity which is looked at. The form of business organization has little to do with the underlying unity or diversity of the business enterprise. While the hearing officer articulated no factual findings for this first factor, it is clear to us that the activitiy involved, viz.: operating a raceway, is wholly distinct and diverse from operating a sand and gravel business. Thus, as to this first factor, we find support for the decision that the Texas speedway and Michigan sand and gravel operations were separate and distinct enterprises.

The second factor concerns functional integration of the two businesses. As to it the hearing officer found that (1) aside from centralized administrative services in Michigan, the two enterprises acted relatively autonomously, particularly on a day-to-day basis, (2) the speedway did not enhance the use of the sand and gravel enterprise's existing resources, (3) the track was purchased as an investment to protect petitioner's financial interests, and (4) there was no substantial flow of value between the speedway and the sand and gravel enterprise. These findings are supported by substantial evidence. Although administrative services were centralized in Michigan, the sand and gravel enterprise was so functionally different from the speedway that it is difficult to perceive how there could be functional integration. While petitioner's executive staff did oversee both the sand and gravel and the speedway enterprises, this does not presumptively foreclose finding that, functionally, the two were administered as separate and distinct enterprises. The speedway was not an integral part of the sand and gravel enterprise. It was purchased to protect petitioner's claim under a

construction contract. Petitioner's objective was to establish a market value and sell the speedway. Thus, one can reasonably conclude that the decision was made with an eye toward achieving a short-range goal. There is no evidence that decisions were made to coordinate the sand and gravel enterprise with the speedway enterprise so as to optimize overall short-range or long-range profits for petitioner. Consequently, we find that the hearing officer's finding of no functional integration is supported by substantial evidence.

The third factor concerns the extent of centralized management. The hearing officer found some evidence of centralization: (1) payroll and expense checks were signed at the Wixom office in Michigan; (2) most of the accounting work was handled by the same accountant responsible for the sand and gravel enterprise, and (3) a managerial link existed through the vice-president. The hearing officer also found decentralization evidenced by (1) a limited separate bank account in Texas and (2) an indication that payroll taxes were cared for by an accountant in Texas. Furthermore, the hearing officer found that there was no proof offered on centralized company-wide policies or pay scales, on joint meetings by personnel from both businesses at the track manager's level, on the preparation of consolidated financial statements, and on joint retention of legal counsel. Ultimately, the hearing officer made no conclusion as to whether the factor of centralized management came down on the side of a unitary business or a distinct and separate enterprise. Given the fact that, as previously discussed, petitioner has the burden of proof to show error, and the fact that the hearing officer appeared to conclude this factor was largely a draw, we are unable to find error.

The fourth factor of a "unitary business" is

economies of scale. The hearing officer concluded that the evidence adduced at the hearing did not concretely reveal any benefits resulting from the asserted consolidation of the speedway and sand and gravel enterprises. We agree. Although major decisions such as purchasing were centralized in Michigan, there was no evidence that this resulted in increased profits through bulk purchases or an improved allocation of resources. This is a pertinent factor. *F W Woolworth Co, supra.* Other economies of scale, such as an ability to secure financing at a more advantageous rate, were neither alleged nor proved.

The fifth and final factor involves the question of whether substantial mutual interdependence exists. *Container Corp, supra.* The hearing officer recognized that some aspects of the sand and gravel and speedway enterprises were related because, as previously discussed, the administrative and financial services were centralized in Michigan and major decisions were made by the same executive officers overseeing both enterprises. Furthermore, the speedway was acquired as a direct consequence of petitioner's construction activity. However, the hearing officer concluded that there was no "substantial" interdependence because there was no showing that a quantifiable flow of business value existed or that one enterprise's stable operations was important to the other's "full utilization" of capacity. *F W Woolworth Co, supra.* This was a correct legal analysis and was supported by substantial evidence.

In summary, in order to find a business activity to be a "unitary business,"

> there [must] be some sharing or exchange of value not capable of precise identification or measurement—beyond the mere flow of funds arising

out of a passive investment or a distinct business operation—which renders formula apportionment a reasonable method of taxation. [*Container Corp of America,* 463 US 166.]

The hearing officer concluded from the totality of the five factors discussed above that petitioner's Texas speedway was a separate and distinct enterprise from its Michigan sand and gravel enterprise. The nexus necessary to support apportioned taxation of its business income in Michigan was lacking. We agree and further agree that, from this, it can be concluded that the Texas speedway's losses for 1972 and 1973 should be treated as "nonbusiness income" for purposes of the allocation and apportionment provisions of the Income Tax Act of 1967 and excluded from petitioner's Michigan taxable income.

Our decision in the above respect is supported by a sixth factor—one not mentioned by the hearing officer or Tax Tribunal but whose factual basis appears in exhibit 4 of the record. In its Michigan income tax return for the fiscal year ending June 30, 1973 (this being the second tax year involved in the instant suit), petitioner subtracted the capital gain of $662,022.02 from the sale of land adjacent to the Texas speedway from its Michigan tax base as nonbusiness income.[3] If, as petitioner contends, the speedway operations were unitary with petitioner's sand and gravel operations, any capital gain arising from the sale of land associated with the speedway would be business income from a unitary enterprise. As such it would be taxable in Michigan. *Johns-Manville Products Corp v Comm'r of Revenue Administration,* 115 NH 428;

---

[3] On June 1, 1973, Holloway sold 1,988 acres of unimproved and unused land which it had purchased in 1971 as part of the speedway transaction. The sale price was $1,236,374.99 and the 1971 purchase price was $574,352.97.

343 A2d 221 (1975). In essence, petitioner's treatment of its capital gain from speedway land as nonunitary is inconsistent with its claim in the instant case that the Texas operation was unitary. Petitioner should not have it both ways.

II

In the second issue on appeal petitioner contends that the Tax Tribunal's failure to enter a timely decision requires reversal or abatement of all interest assessed on the tax deficiency. It is undisputed that a substantial delay occurred. The evidentiary hearing before the SBTA was held on June 29, 1978, and the thirty-page proposed judgment of the hearing officer was issued February 6, 1985. On May 21, 1985, the Tax Tribunal adopted the proposed judgment as its final decision.

A similar claim that the judgment should be reversed because of inordinate delay between the date of hearing by the SBTA and the date of decision by the newly created Tax Tribunal was rejected by this Court in *Master Craft Engineering, supra.* Our Court held that a taxpayer must show prejudice in order to justify reversal. Petitioner claims prejudice because the approximate seven-year delay foreclosed petitioner from obtaining relief in the intervening years. The facts show otherwise. The speedway was sold two years before the evidentiary hearing. Similarly, the Single Business Tax replaced the corporate income tax on January 1, 1976. Also, there are currently pending before the Tax Tribunal deficiency assessments against petitioner for the taxable period June 30, 1973, to December 31, 1975. Given these facts we fail to see that petitioner was prejudiced.

However, the *Master Craft* Court did grant an abatement of interest on grounds that the 3½-year delay in reaching a decision was not attributable to the taxpayer.     ᴵ

> Furthermore, because the delay in reaching a decision was not attributable to actions on the part of petitioner, we do not find it equitable for petitioner to be assessed interest over this long period of time. Accordingly, interest should not have accrued between the date when the decision should have been reached, that is, August 6, 1980, through the date when such was actually rendered, that being August 30, 1983. [141 Mich App 74-75.]

In the instant case not all of the delay was attributable to the Treasury Department. By statute, judgment should have been rendered by the SBTA twenty days after the evidentiary hearing on June 29, 1978.[4] However, a thirty-day delay was requested and granted to petitioner in order to obtain and submit certain documents to the SBTA. The documents were filed on July 12, 1978. In addition, the parties were allowed thirty days from July 31, 1978, to file post-hearing briefs and fifteen days to file reply briefs. Petitioner filed a reply brief on September 29, 1978. Thus, it would be equitable to abate interest for the period following twenty days after September 29, 1978. This is when the decision should have been rendered. Accordingly, we determine that interest is abated for the period commencing October 20, 1978.

Judgment affirmed. Interest on judgment is abated commencing October 20, 1978. No costs, neither party having prevailed in full.

[4] MCL 205.7; MSA 7.657(7). Repealed by 1980 PA 162.