# STATE OF MICHIGAN

# COURT OF APPEALS

---

MENARD, INC.,

        Petitioner-Appellee,

v

CITY OF ESCANABA,

        Respondent-Appellant,

and

MICHIGAN MUNICIPAL LEAGUE,
MICHIGAN TOWNSHIPS ASSOCIATION,
MICHIGAN ASSOCIATION SCHOOL
BOARDS, MICHIGAN SCHOOL BUSINESS
OFFICIALS, MICHIGAN ASSOCIATION OF
COUNTIES, and MICHIGAN ASSESSORS
ASSOCIATION,

        Amici Curiae.

FOR PUBLICATION
May 26, 2016
9:10 a.m.

No. 325718
Tax Tribunal
LC No. 00-441600;
14-001918-TT

---

Before: TALBOT, C.J., and HOEKSTRA and SHAPIRO, JJ.

PER CURIAM.

        This case arises out of ad valorem property tax assessments for the tax years 2012, 2013, and 2014. The subject property is a 166,196 square foot "big-box" store built on 18.35 acres and located in Escanaba, Michigan. After a hearing on petitioner Menard, Incorporated's challenge to respondent City of Escanaba's tax assessment, the Michigan Tax Tribunal (the tribunal) rejected Escanaba's assessment and found in favor of Menard. Because we conclude that the tribunal made an error of law and its decision was not supported by competent, material, and substantial evidence, we reverse.

## I. FACTS

        Menard filed a petition to appeal the ad valorem property tax assessments for tax years 2012, 2013, and 2014 for property located in the City of Escanaba. Escanaba made the following valuations of the property: (1) in 2012 the true cash value (TCV) was $7,815,976; (2)

-1-

in 2013 the TCV was $7,995,596; and (3) in 2014 the TCV was $8,210,938. Menard contended that the TCV for each year was only $3,300,000.

In support of its position, Menard submitted a valuation appraisal prepared by Joseph Torzewski, a commercial real estate appraiser. Torzewski opined in his report that the property's highest and best use (HBU) was "for continued use of the existing improvements as a free-standing retail building." Torzewski stated that he appraised the "fee simple interest" in the subject property.

Torzewski reached his opinion on the property's TCV by developing the sales-comparison and income approaches to valuation.[1] In his sales-comparison approach, Torzewski provided eight comparable sales. Because he found no other big-box stores in the Upper Peninsula, he used buildings primarily located in southeast Michigan. The record contains the following information on the eight comparables used by Torzewski:

1. Comparable 1 was a former Home Depot built in 2006, located in Holland, Michigan, and had 103,000 square feet. The structure was sold in 2014. The record does not contain any information on the current or intended future use of the building, but does state that deed restrictions limit its ability to be used as a retail space;

2. Comparable 2 was a former Circuit City built in 1996, located in Westland, Michigan, and had 63,686 square feet. The structure was sold in 2013 to the City of Westland which turned it into a city hall;

3. Comparable 3 was a former Wal-Mart built in 1989, located in Alma, Michigan, and had 122,790 square feet. The building was sold in 2012 for redevelopment as industrial property. The property contained deed restrictions that prohibited use of the property as a grocery store over 35,000 square feet or a discount store over 50,000 square feet;

4. Comparable 4 was a former Sam's Club built in 1986, located in Madison Heights, Michigan, and had 113,262 square feet. The building was sold in 2012 for redevelopment as industrial property;

5. Comparable 5 was a former Wal-Mart built in 1995, located in Auburn Hills, Michigan, and had 151,017 square feet. The building was sold in 2011 for redevelopment as industrial property. The property contained deed restrictions that prohibited use of the property as a grocery store over 35,000 square feet or a discount store over 50,000 square feet;

---

[1] The parties stipulated that, because the subject property was not income-producing, the income approach was inapplicable. In its final opinion and judgment, the tribunal gave no weight to the income approach. That decision has not been challenged on appeal.

6. Comparable 6 was a former furniture store built in 1986, located in Flint, Michigan, and had 53,474 square feet. The building was sold in 2010 and continues to function as a furniture store;

7. Comparable 7 was a former Kroger built in 1981, located in Dearborn, Michigan, and had 55,474 square feet. The building was sold in August 2010, but no detail is contained in the record about the current or future use of the building other than that it is intended for future retail use; and

8. Comparable 8 was a former Wal-Mart built in 1993, in Monroe, Michigan, and had 130,626 square feet. The building was sold in 2009 to be divided into multi-tenant space with current tenants being Dunham's Sports and Hobby Lobby. The property contained deed restrictions that prohibited use of the property as a grocery store over 35,000 square feet or a discount store over 50,000 square feet.

In his valuation report, Torzewski mentioned that Comparable 1 had deed restrictions. He did not reference deed restrictions with regard to any of the other comparables, nor did he make any adjustments for the existence of deed restrictions. At the hearing, however, Torzewski testified that most of the properties contained deed restrictions. Specifically, he acknowledged that Comparables 1, 3, 5, and 8 had use restrictions, but Comparables 6 and 7 did not.[2] He testified that he took the deed restrictions into account, explaining that in selecting comparables, he would inquire if the deed restrictions affected the sales price. He stated that if he could not get that information he would not use the sale as a comparable. He testified that "in many cases" deed restrictions did not "have any effect on the sales price because the restrictions that were in place aren't anything really out of the ordinary or would affect the secondary user of the property, so, therefore, we—in the conditions of the sales adjustment . . . grid there are no adjustments for that condition of sale factor." Torzewski explained that it was "pretty common for build-to-suit owners" to put deed restrictions on their property "to exclude any sort of use that might be a competitive use." He testified that, after speaking to the brokers, sellers, and buyers, he was satisfied that the deed restrictions had no impact on the price obtained for the comparables used in the valuation for Menard. However, Torzewski's appraisal report showed that Comparables 6 and 7, the ones he noted had no restrictions, had the highest selling price per square foot.

After making adjustments for other differences in the comparables, Torzewski concluded that the subject premises should be valued at $20 per square foot for tax years 2012, 2013, and 2014.

Diana Norden, the city assessor for Escanaba, opined that the comparables used by Torzewski were "not great." She testified that, after researching Menard's comparables, she learned: Comparable 1 was subject to a building easement and had use restrictions, Comparable 2 was not a freestanding unit but had multiple storefronts, Comparable 3 looked like someone

---

[2] According to Torzewski, the "larger, more big-box-type stores did have some deed restrictions in place" as opposed to "a couple of the smaller [comparables]," which did not have restrictions.

buying themselves out of a lease, Comparable 4 had been foreclosed on, and Comparables 5 and 8 had use restrictions. Criticism of Menard's comparable selection was also offered by Miles Anderson, an expert in appraisal review. He, like Norden, testified that Comparable 1 had use restrictions. More generally, he criticized Menard's appraisal for failing to state, explain, or make adjustments for use restrictions on the sales comparables.

In support of its assessment of value, Escanaba submitted a valuation summary prepared by Norden. Norden primarily used the cost-less-depreciation approach to value the property. She testified that she used the cost-less-depreciation approach because there were insufficient comparable sales and because the building being valued was a newer construction. She opined that properties with deed restrictions should not be compared to the subject property, which had no use restrictions in place. She testified that she adjusted the value for depreciation, but that she did not adjust for functional obsolescence. Norden, who was admitted as an expert in appraisal, opined that there was no functional obsolescence in the property because, if purchased for its existing use, other retailers would use the components of the existing building.

By contrast, Torzewski testified that he did not use the cost-less-depreciation approach because functional obsolescence is built into built-to-suit big-box stores, and because, in a down market, a property like the subject property would have external obsolescence. He testified that both the functional and external obsolescence need to be accounted for in depreciation under the cost-less-depreciation approach, but that with this building, accounting for the obsolescence would be difficult. Torzewski also stated that the buyers of similar buildings do not use the cost-less-depreciation approach and that owners of properties like the subject property are typically not concerned with reselling, but are instead looking to maximize their floor space. Torzewski did not, however, identify any specific features of the building that created functional obsolescence, nor did he identify any economic factors in the subject market that would account for external obsolescence.

Following a hearing, the tribunal concluded that the TCV for 2012 was $3,325,000, the TCV for 2013 was $3,490,000, and the TCV for 2014 was $3,660,000. In its reasoning, the tribunal concluded that Escanaba's cost-less-depreciation approach should be given no weight because Norden did not account for functional or external obsolescence. The tribunal also credited Menard's assertion that the cost-less-depreciation approach should not be used to value the subject property because (1) functional obsolescence is difficult to calculate and (2) first-generation users are concerned with optimizing sales, not with optimizing market value to the property. The tribunal also concluded that Norden's sales-comparison approach did not provide sufficient data for the tribunal to arrive at an independent conclusion because Norden did not make any analytical adjustments for differences in the properties. By contrast, the tribunal concluded that the sales-comparison approach advanced by Menard was persuasive and was meaningful to an independent determination of market value. On reconsideration, the tribunal specifically found that the deed restrictions in Menard's comparables did not require an adjustment because it found credible Torzewski's testimony that the deed restrictions had no effect on the sales price of the deed-restricted comparables.

## II. STANDARD OF REVIEW

-4-

In the absence of fraud, our review of Tax Tribunal determinations "is limited to determining whether the tribunal made an error of law or adopted a wrong legal principle." *Meijer, Inc v City of Midland*, 240 Mich App 1, 5; 610 NW2d 242 (2000). "The tribunal's factual findings are upheld unless they are not supported by competent, material, and substantial evidence." *Id.* Substantial evidence is "evidence that a reasoning mind would accept as sufficient to support a conclusion." *Kotmar, Ltd v Liquor Control Comm*, 207 Mich App 687, 689; 525 NW2d 921 (1995). "Substantial evidence must be more than a scintilla of evidence, although it may be substantially less than a preponderance of the evidence." *Jones & Laughlin Steel Corp v City of Warren*, 193 Mich App 348, 352-353; 483 NW2d 416 (1992). "Failure to base a decision on competent, material, and substantial evidence constitutes an error of law requiring reversal." *Meijer, Inc*, 240 Mich App at 5. The entire record, "not just the portions that support the agency's findings," must be reviewed when evaluating the tribunal's final determination. *Stege v Dep't of Treasury*, 252 Mich App 183, 188; 651 NW2d 164 (2002). Further, cursory rejection of evidence is also erroneous. *Jones & Laughlin Steel Corp*, 193 Mich App at 354.

The petitioner, Menard, bears the burden of proving the true cash value (TCV) or the property. MCL 205.737(3).

> The burden of proof encompasses two concepts: "(1) the burden of persuasion, which does not shift during the course of the hearing; and (2) the burden of going forward with the evidence, which may shift to the opposing party." *Jones & Laughlin Steel Corp*, [193 Mich App at 354-355]. Nevertheless, because Tax Tribunal proceedings are de novo in nature, the Tax Tribunal has a duty to make an independent determination of true cash value. *Great Lakes Div of Nat'l Steel Corp*[ *v City of Ecorse*, 227 Mich App 379, 409; 576 NW2d 667 (1998)]. Thus, even when a petitioner fails to prove by the greater weight of the evidence that the challenged assessment is wrong, the Tax Tribunal may not automatically accept the valuation on the tax rolls. *Id.* at 409. Regardless of the method employed, the Tax Tribunal has the overall duty to determine the most accurate valuation under the individual circumstances of the case. *Meadowlanes Ltd Dividend Housing Ass'n v City of Holland*, 437 Mich 473, 485–486, 502; 473 NW2d 636 (1991). [*President Inn Props, LLC v City of Grand Rapids*, 291 Mich App 625, 631; 806 NW2d 342 (2011).][3]

---

[3] Menard asserts that Escanaba, as the appellant, now bears the "burden of proof" in establishing the TCV of the subject property. This is not strictly accurate. On appeal, in order for the appellant to receive relief, it has the burden to demonstrate that the lower court erred as governed by the relevant standard of review. However, at the tribunal, initially and on remand, the burden of proof to establish TCV is on the petitioner. *President Inn Props*, 291 Mich App at 631. Menard relies on *Drew v Cass Co*, 299 Mich App 495; 830 NW2d 832 (2013) in suggesting that the "burden of proof" is on the taxing authority when it is the appellant. Indeed, in *Drew*, we stated, "[t]he appellant bears the burden of proof in an appeal from an assessment, decision, or order of the Tax Tribunal." *Id.* at 499 (quotation omitted). In that case, however, the petitioner,

## III. APPROACHES TO VALUATION

"The Tax Tribunal is under a duty to apply its expertise to the facts of a case in order to determine the appropriate method of arriving at the true cash value of property, utilizing an approach that provides the most accurate valuation under the circumstances." *Great Lakes*, 227 Mich App at 389. TCV "means the usual selling price at the place where the property to which the term is applied is at the time of assessment, being the price that could be obtained for the property at private sale, and not at auction sale . . . or forced sale." MCL 211.27(1). TCV is the equivalent of the property's fair market value. *Great Lakes*, 227 Mich App at 389.

"[T]o determine true cash value, *the property must be assessed at its highest and best use.*" *Huron Ridge, LP v Ypsilanti Twp*, 275 Mich App 23, 33; 737 NW2d 187 (2007) (emphasis added). The concept of "highest and best use . . . recognizes that the use to which a prospective buyer would put the property will influence the price that the buyer would be willing to pay for it." *Great Lakes*, 227 Mich App at 408. "The concept . . . is fundamental to the determination of true cash value." *Detroit Lions, Inc v Dearborn*, 302 Mich App 676, 697; 840 NW2d 168 (2013). "Highest and best use" is defined as " 'the most profitable and advantageous use the owner may make of the property even if the property is presently used for a different purpose or is vacant, so long as there is a market demand for such use.' " *Id.*, quoting *Detroit/Wayne Co Stadium Auth v Drinkwater, Taylor & Merrill, Inc*, 267 Mich App 625, 633; 705 NW2d 549 (2005). The tribunal is required to make a determination of a subject property's highest and best use. *Detroit Lions*, 302 Mich App at 697.

The parties agree that the highest and best use of the property is as an owner-occupied freestanding retail building.[4] Their disagreement lies in the valuation methodologies to be

---

not the respondent, was the appellant. *Id.* at 496. The *Drew* Court cited *ANR Pipeline Co v Dep't of Treasury*, 266 Mich App 190, 198; 699 NW2d 707 (2005) in support of the proposition. The petitioner, not the respondent, was the appellant in *ANR Pipeline*. *Id.* at 191. The *ANR Pipeline* Court cited *Dow Chem Co v Dep't of Treasury*, 185 Mich App 458, 463; 462 NW2d 765 (1990) in support of the proposition. In *Dow Chem*, however, the petitioner was also the appellant. *Dow Chem Co*, 185 Mich App at 459. The *Dow Chem* Court cited *Holloway Sand & Gravel Co Inc v Dep't of Treasury*, 152 Mich App 823, 831 n 2; 393 NW2d 921 (1986), another case where the appellant and the petitioner were the same party. *Id.* at 831. Critically, the *Holloway Sand & Gravel* Court relied on MCL 205.7, which, at the time had already been repealed by 1980 PA 162. Prior to its repeal, MCL 205.7 provided that "[t]he burden of proof in any appeal from any assessment, decision or order shall rest with the appellant," but, critically, the statute referred to the appellant and the taxing authority as separate entities. See 1941 PA 122, § 7, now codified at MCL 205.22. Accordingly, we conclude that the statement in *Drew* that the burden of proof is on the appellant does not shift the burden to establish TCV from petitioner to respondent. Rather, in its proper context, it is apparent that the reference to "appellant" in *Drew* and its progeny actually refers to petitioner.

[4] Escanaba and the amicus argue that the tribunal failed to make an explicit determination of the property's HBU. However, we find that such a finding is implicit in the tribunal's decision, which recounted in the findings of fact that the parties did not dispute the HBU. Given that the

-6-

employed and the data relevant to the valuation. The three valuation methodologies that have been "found acceptable and reliable by the Tax Tribunal and the courts" are the cost-less-depreciation approach, the sales-comparison or market approach, and the capitalization of income approach. *Meadowlanes Dividend Housing Ass'n*, 437 Mich at 484-485. While, if possible, all three methods should be used, the "final value determination must represent the usual price for which the subject property would sell" irrespective of the specific method employed. *Id.* at 485.

As noted, the parties and the tribunal agreed that the income approach does not apply in this case. The tribunal also rejected the cost-less-depreciation approach advanced by Escanaba, but found the values in Menard's sales-comparison approach to be meaningful.

## A. SALES-COMPARISON APPROACH

We first examine whether the tribunal's reliance on the sales-comparison approach advanced by Menard was supported by competent, material, and substantial evidence.

Menard owns a fee simple interest in the subject property. The property, as it currently exists, is not subject to any use restrictions. However, half of the comparables in Torzewski's sales-comparison valuation contained deed restrictions that limited the use of the properties for retail purposes, thereby preventing sale of an entire fee simple interest in the property. Torzewski failed to mention all the deed restrictions in his valuation report, did not make any adjustments for their existence, and, during his testimony, he insisted that the restrictions did not affect the value of the comparables because the parties involved in the comparable sales told him that the restrictions did not affect the sale price. The tribunal accepted Torzewski's testimony and used the deed-restricted comparables in its determination of value. We conclude that the tribunal's finding was based on an error of law and was not supported by competent, material, and substantial evidence.

In *Helin v Grosse Pointe Twp*, 329 Mich 396, 407-408; 45 NW2d 338 (1950), our Supreme Court recognized that deed restrictions in property that prohibited its use for an "apartment house, multiple residence, or institutional purposes" would have an effect on the value of the property. Accordingly, it would be error to fail to consider "deed restrictions in establishing assessments[.]" *Kensington Hills Dev v Milford*, 10 Mich App 368, 372; 159 NW2d 330 (1967). This Court emphasized further in *Lochmoor Club v Grosse Pointe Woods*, 10 Mich App 394, 397-398; 159 NW2d 756 (1968), that all factors, including "restrictions imposed" on property must be considered in determining a property's TCV.

Although Torzewski testified that he considered the deed restrictions, the record is insufficient to support his assertion that they had no effect on the sales price for the restricted comparables. His testimony is that he consulted the brokers, sellers, and buyers of the comparables. Thus, that testimony is only sufficient to establish that *to the parties involved in the actual transaction*, the deed restrictions did not affect the sales price they were willing to

---

matter was not contested and that the tribunal recognizes the agreed-upon HBU, we conclude that the tribunal did not err by not expressly stating the HBU.

pay. In other words, the market for sale was limited to those purchasers who were willing to accept the restrictions and so did not reflect the full value of the unrestricted fee simple.

However, in assessing TCV, the property "must be assessed at its highest and best use," *Huron Ridge*, 275 Mich App at 33, which in this case is as an owner-occupied freestanding retail building. Deed restrictions that limit the ability of prospective buyers to use the comparable properties for the subject property's HBU necessarily limit, if not eliminate, the willingness of those buyers to purchase the restricted property. Those who would be interested in buying the property *with restrictions* would need to make modifications to convert the building from retail to something else, like industrial use. Given the need to convert, the buyers would necessarily pay a lower price.

For the same reasons, the anti-competitive nature of the deed restrictions means that the deed-restricted comparables could not be sold for their HBU. The potential buyers of the comparables were therefore limited to buyers willing to accept the use restrictions. Further, because of the prevalence of the self-imposed deed restrictions on big-box stores, there is essentially no market for big-box stores being sold for the HBU of the subject property. Thus, half of Torzewski's comparables were not evaluated at the HBU of the subject property because the deed restrictions expressly prohibited their use as a freestanding retail center.

On this record, there is no evidence to account for the impact of the deed-restricted properties being sold for purposes other than the HBU of the subject property. It is plain that no adjustments were taken for this major difference in the subject property and the restricted comparables. Accordingly, we conclude that the tribunal erred in finding Menard's sales-comparison approach meaningful to its determination of the subject property's TCV. The tribunal did not value the subject property at its HBU, an owner-occupied freestanding retail building, but instead valued it as a former owner-occupied freestanding retail building that could no longer be used for its HBU and could best be used for redevelopment for a different use. In doing so, the trial court made an error of law by failing to value the subject property at its HBU.

## B. COST-LESS-DEPRECIATION APPROACH

The tribunal rejected the cost-less-depreciation approach advanced by Escanaba. However, because the deed restrictions imposed by other big-box store owners drastically limited the actual market for such properties, it is appropriate to look at the cost-less-depreciation approach.[5]

---

[5] Menard argues that use of the sales-comparison approach over the cost-less-depreciation approach is supported by this Court's two recently issued unpublished opinions on the valuation of similar "big-box" stores in *Lowe's Home Ctrs v Twp of Marquette*, unpublished opinion per curiam of the Court of Appeals, issued April 22, 2014 (Docket Nos. 314111 and 314301), and *Lowe's Home Ctrs Inc v Grandville*, unpublished opinion per curiam of the Court of Appeals, issued December 30, 2014 (Docket No. 317986). We disagree. In those cases, the salient issue was whether, using the sales-comparison approach, comparables should be to the fee simple

"The adjusted-cost-of-reproduction-less-depreciation method is most suitable for industrial facilities for which no market, an inadequate market, or a distorted market exists." *Tatham v Birmingham*, 119 Mich App 583, 591; 326 NW2d 568 (1982). Here, although there is evidence of a market for big-box stores when they are sold for secondary purposes, there is limited evidence as to whether there is a market for big-box stores at the subject property's HBU. Instead, Torzewski testified that large big-box stores commonly had deed restrictions for anti-competitive purposes, and Norden testified that she could not locate a sufficient number of unencumbered comparables to make adjustments in her sales-comparison approach. As such, the cost-less-depreciation approach is appropriate to value the TCV of the property.

In *Clark Equip Co v Leoni*, 113 Mich App 778, 782-783; 318 NW2d 586 (1982), this Court approached the problem of determining the TCV of an industrial facility. In that case, all of the property's appraisers determined that the industrial property's current use was "also its highest and best use." *Id*. at 782. This Court described the difficulty in determining the TCV to such property and the appropriate solution as follows:

> The reality is that these types of industrial plants are rarely bought and sold . . . . However, as we construe MCL 211.27; MSA 7.27, to the extent that an industrial plant is not so obsolete that, if a potential buyer did exist who was searching for an industrial property to perform the functions currently performed in the subject plant, said buyer would consider purchasing the subject property, the usual selling price can be based upon value in use. . . . To construe MCL 211.27; MSA 7.27, as requiring the taxing unit to prove an *actual* market for a property's existing use would lead to absurd undervaluations. Large industrial plants are constructed to order, in accordance with the exact specifications of the purchasing user. . . . It is ludicrous to conclude, however, that such a brand new, modern, industrial facility is worth significantly less than represented by its replacement cost premised on value in use because, in actuality, such industrial facilities are rarely bought and sold. Thus, we hold that, to the extent a large industrial facility is suited for its current use and would be considered for purchase by a hypothetical buyer who wanted to own an industrial facility which could operate in accordance with the subject property's capabilities, said facility must be valued as if there were such a potential buyer, even if, in fact, no such buyer (and therefore no such market) actually exists. [*Id*. at 784-785 (emphasis in original).]

In other words, *Clark* provides that (1) when the HBU of the property is its existing use and (2) when because the property is built-to-suit there would be little to no secondary market for the

alone or the fee simple plus the value to an occupier of an already existing leasehold or operating business. We determined in both cases, over the objection of the taxing authority, that because the subject premises was owner occupied, it must be valued as if vacant and available. *Lowe's Home Ctrs v Twp of Marquette*, unpub op at 1, and *Lowe's Home Ctrs Inc v Grandville*, unpub op at 7. In other words, those cases held, as do we, that what must be valued is what would actually be sold. In those cases, the sales would be of the property without an existing lessee or operating retail business. In this case, what is being valued is the property without deed restrictions limiting its use.

property where it would still be used at its HBU, then the strict application of the sales-comparison approach would undervalue the property, so the cost-less-depreciation approach is more appropriate.

In *Great Lakes*, this Court elaborated that "valuation can be determined strictly on a hypothetical basis, with the hypothetical buyer looking at the costs of building a new facility to determine the usual price of an existing facility even if a real buyer would not consider building such a facility." *Great Lakes*, 227 Mich App at 403. However, the hypothetical buyer need not "be presumed to have considered building an industrial facility as an alternative to purchasing an existing one when no such facility would be built *and* that hypothetical buyer has the ability to see what is occurring in the marketplace of existing facilities." *Id*. (emphasis in original). Thus, *Great Lakes* states that the holding of *Clark* should not be applied when (1) no facility like the subject facility would actually be built, and (2) a buyer has the ability to see what is occurring in the marketplace of existing facilities. In the present case, there is no indication that "big-box stores" like the subject are not being built. Additionally, because such big-box stores are not typically sold on the marketplace for use as "big-box stores," a buyer does not have the ability to see what is occurring in the marketplace of existing facilities. Thus, the limitation in *Great Lakes* does not apply and this case is governed by *Clark*.

In the present case, given that multiple valuation methods should be used when possible, *Meadowlanes*, 437 Mich at 485, and that the analysis in the first issue shows that the comparables that the tribunal used in this case were not appropriate, the tribunal committed error in refusing to consider Escanaba's evidence under the cost-less-depreciation approach. The evidence demonstrates that owner-occupied freestanding retail buildings like the subject, which Menard describes as "big-box stores," have many similar qualities to the industrial properties that this Court addressed in *Clark*. Both are constructed or built to order to conform to the specifications of the purchasing user and are rarely sold on the open market for their current use. Similar to the plant at issue in *Clark*, there is no indication in the record that the subject premises is not a new, modern facility capable of fully functioning as a freestanding retail center just as the industrial center in *Clark* was modern enough for continued use of the industrial purpose it was designed for. *Clark*, 113 Mich App at 782-783. Therefore, like the industrial plant in *Clark*, it would not be appropriate to value the subject property significantly less than its replacement costs simply because owner-occupied freestanding retail spaces are rarely bought or sold for use as owner-occupied freestanding retail spaces on the open market. Like the industrial plant in *Clark*, the subject premises is well-suited for its current use and would be considered by a hypothetical buyer who wished to own a freestanding retail building in accordance with the subject's capabilities, and, therefore, the property must be valued "as if there were such a potential buyer, even if, in fact, no such buyer . . . actually exists." *Id*. at 785.

Additionally, Menard's and the tribunal's reliance on the concept of functional obsolescence to discredit using the cost-less-depreciation approach is misplaced. The tribunal rejected the cost-less-depreciation approach advanced by Escanaba in part because it concluded

-10-

that Norden failed to adjust for functional obsolescence.[6] Norden, however, testified that she did not adjust for functional obsolescence because there was none in the subject property. She explained that, considering the property's HBU, the same building would be built by Menard if it were to build a new store. Further, she testified that the existing building would be used in essentially the same fashion if a competitor were to purchase the property. Although Torzewski testified that it would be difficult to value functional obsolescence, he did not identify any functional obsolescence presently in the subject property, other than to suggest that the building was automatically functionally obsolete the moment it was completed. He also suggested in general terms that there was external obsolescence because the market for big-box stores was a "down market" because there was little to no demand for the properties.

There was no evidence in the record of any deficiency in the subject premises that would inhibit its ability to properly function as an owner-occupied freestanding retail building. The functional obsolescence to which Menard refers appears to be the fact that, due at least in part to self-imposed deed restrictions that prohibit competition, such freestanding retail buildings are rarely bought and sold on the market for use as such but are instead sold to and bought by secondary users who are required to invest substantially in the buildings to convert them into other uses, such as industrial use. However, as stated in *Clark*, to read MCL 211.27 "as requiring the taxing unit to prove an *actual* market for a property's existing use would lead to absurd undervaluations." *Clark*, 113 Mich App at 785 (emphasis in original). Therefore, the tribunal erred by failing to consider evidence under the cost-less-depreciation approach.[7]

## IV. CONCLUSION

---

[6] To determine the present TCV of property under the cost-less-depreciation approach, depreciation must be subtracted from the replacement costs. *Teledyne Continental Motors v Muskegon Twp*, 145 Mich App 749, 755; 378 NW2d 590 (1985). Depreciation includes functional obsolescence. *Id.* "Functional obsolescence is a loss in value brought about by failure or inability to deliver full service." *Id.* It can include loss of value due to "shortcomings or undesirable features contained within the property itself. . . . such as poor floor plan, inadequate mechanical output, or functional inadequacy or superadequacy due to size or other characteristics." *Id.*

[7] Escanaba also argues that the tribunal's decision should be reversed because it accepted a non-authoritative definition of the phrase "big-box" store. Menard's expert relied on a definition of "big-box store" from the Dictionary of Real Estate Appraisal, whereas Escanaba's expert in appraisal review relied on definitions from Investopedia, Wikipedia, and businessdictionary.com. However, the closest the tribunal came to addressing the debate over the definition of the term "big-box" store was when it criticized Escanaba's expert's use of "internet definitions." The tribunal did not, however, adopt the definition of "big-box" store advocated by Menard or base its conclusions regarding the sales-comparison approach or the cost-less-depreciation approach on Menard's definition of "big-box" store.

The tribunal committed an error of law requiring reversal when it rejected the cost-less-depreciation approach and adopted a sales-comparison approach that failed to fully account for the effect on the market of the deed restrictions in those comparables. Given this error, and the fact that there is little if any evidence in the record as to the impact of the deed restrictions on the comparables, we conclude that it is inadequate to simply remand to the tribunal for a new determination as to value. Instead, on remand, the tribunal shall take additional evidence with regard to the market effect of the deed restrictions. If the data is insufficient to reliably adjust the value of the comparable properties if sold for the subject property's HBU, then the comparables should not be used. The tribunal shall also allow the parties to submit additional evidence as to the cost-less-depreciation approach.[8] After allowing the parties the opportunity to present additional testimony in light of the deficiencies identified in this opinion, the tribunal shall make an independent determination of the property's TCV using correct legal principles. In doing so, the tribunal must "apply its expertise to the facts of a case in order to determine the appropriate method of arriving at the true cash value of property, utilizing an approach that provides the most accurate valuation under the circumstances." *Great Lakes*, 227 Mich App at 389.

Reversed and remanded. We do not retain jurisdiction.

/s/ Michael J. Talbot
/s/ Joel P. Hoekstra
/s/ Douglas B. Shapiro

---

[8] As noted above, the parties agree that the income approach is inapplicable.