*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

GREENFIELD - 8 MILE PLAZA,

Petitioner-Appellant,

v

CITY OF SOUTHFIELD,

Respondent-Appellee.

UNPUBLISHED
December 12, 2019

No. 346183
Tax Tribunal
LC No. 17-001491

Before: SWARTZLE, P.J., and MARKEY and REDFORD, JJ.

PER CURIAM.

Petitioner challenges respondent's tax assessment of petitioner's real property for the 2017 tax year. The Michigan Tax Tribunal determined that the real property was underassessed for 2017, but that the underassessment did not affect the property's taxable value. Petitioner appeals as of right, and we affirm.

## I. BACKGROUND

Petitioner owns real property on Eight Mile Road in Southfield, Michigan. The property formerly operated as a Home Depot store. Petitioner purchased the property in 2004, subject to a deed restriction that prevented the property from being used, among other things, as a home-improvement center or hardware store. Petitioner used the property as a wholesale business from which to sell products to retailers who operate dollar stores. The business was not open to the general public; rather, petitioner required that its customers maintain memberships to purchase items. The property also had a showroom to display items it sold to its members. The property is located near the Lodge and Southfield freeways. It is also near the former Northland Mall, which had closed and was slated to be demolished.

For tax year 2017, respondent determined that the property had a true-cash value of $4,046,500, an assessed value of $2,023,250, and a taxable value of $1,649,430. Petitioner unsuccessfully appealed the 2017 assessment before the local board of review, and then filed an appeal with the Tax Tribunal. Petitioner initially argued that the property's true-cash value, as of December 31, 2016, was no more than $3,100,000. Petitioner later asserted in its valuation

-1-

disclosure that the property's true-cash value was actually $2,900,000, and therefore, the assessed and taxable values should be no more than $1,450,000.

At the hearing in the Tax Tribunal, petitioner offered the testimony of its expert witness, Daniel Tomlinson. He testified that the closure of the Northland Mall, the general decline of retail businesses in the area, and difficulty accessing the property from Eight Mile Road devalued the property as a retail location. He also testified that the deed restriction limited its value for the operation of a retail business. Tomlinson concluded that the property's highest and best use was as an industrial warehouse. Although Tomlinson acknowledged that the property was not zoned for industrial use, he maintained that it was already being used as a warehouse. He therefore considered sales of other industrial properties used as warehouses when performing an appraisal of the property using the sales approach. He also considered sales of shopping centers. Using the sales approach, he opined that the property had a market value of $2,890,000.

Tomlinson also used an income-capitalization approach to value the property, in which he looked at the market for rentals of comparable properties. He again evaluated both industrial properties used as warehouses and properties operated as shopping centers. Using the income-capitalization approach, he opined that the property had a value of $2,990,000. Averaging the results of the sales approach and the income-capitalization approach, Tomlinson opined that the subject property had a true-cash value of $2,900,000.

Jacob Thurston, respondent's deputy city assessor, prepared a valuation disclosure for respondent and concluded that the property's location increased its value. He believed that the highest and best use of the property was as a retail-oriented business, as petitioner was then using the property. Although petitioner described the property as a wholesale warehouse, Thurston testified that petitioner was still using it as a retail operation because petitioner was selling products to its members from that location. According to Thurston, the fact that petitioner did not sell to the general public, but only to its members, did not change the fact that it was conducting a retail operation.

According to Thurston, the existing zoning classification did not permit the property to be used as an industrial warehouse. Petitioner's current use of the property as a retail operation, however, was permitted within the city's existing "B-3" general-business-zoning classification. Thurston further believed that the deed restriction for the property was common and also limited, because, apart from several provisions not relevant here, the restriction only prevented the property from being used as a business similar to a home improvement or hardware store. The restriction did not prevent numerous other retail uses of the property and, therefore, Thurston opined that the restriction was "[n]ot very restrictive at all."

Thurston used the sales approach to determine the property's value. He found three properties that had formerly been used as "big box" retail stores before they were sold to second-generation owners, including one in close proximity to the subject property. He disagreed with Tomlinson's consideration of industrial properties or shopping centers because, in his opinion, those types of properties attract different buyers. Under his analysis, Thurston believed that the subject property had a true-cash value of $4,500,000.

In its findings, the tribunal disagreed with petitioner's appraisal because it was based on a valuation of the property for an industrial use, which was not a permissible use under the city's existing zoning classification. The tribunal also noted that Tomlinson failed to address the feasibility of changing the zoning classification. Therefore, the tribunal gave no weight to Tomlinson's use of comparable sales that involved industrial properties or shopping centers. The tribunal also rejected Tomlinson's reliance on an income-capitalization approach because the subject property was owner-occupied, not leased. In contrast, the tribunal noted that Thurston determined the property's value on the basis of comparable sales of similar "big box" stores. The tribunal also determined that the deed restriction did not have a significant impact on the property's value. The tribunal found, on the basis of the evidence, that the true-cash value of the property was $4,500,000, which meant it was underassessed in 2017, but that underassessment did not affect the property's taxable value.

Petitioner appeals from the decision of the Tax Tribunal.

II. ANALYSIS

In *Briggs Tax Serv, LLC v Detroit Pub Sch,* 485 Mich 69, 75; 780 NW2d 753 (2010), our Supreme Court explained:

> The standard of review of Tax Tribunal cases is multifaceted. If fraud is not claimed, this Court reviews the Tax Tribunal's decision for misapplication of the law or adoption of a wrong principle. We deem the Tax Tribunal's factual findings conclusive if they are supported by "competent, material, and substantial evidence on the whole record." But when statutory interpretation is involved, this Court reviews the Tax Tribunal's decision de novo.

Property is generally required to be "assessed at 50% of its true cash value." MCL 211.27a(1); see also Const 1963, art 9, § 3. "[T]rue cash value" is defined, in relevant part, as "the usual selling price at the place where the property to which the term is applied is at the time of assessment, being the price that could be obtained for the property at private sale." MCL 211.27(1). In *Menard, Inc v Escanaba*, 315 Mich App 512, 521-522; 891 NW2d 1 (2016), this Court explained:

> The Tax Tribunal is under a duty to apply its expertise to the facts of a case in order to determine the appropriate method of arriving at the true cash value of property, utilizing an approach that provides the most accurate valuation under the circumstances. . . . TCV is the equivalent of the property's fair market value.
>
> To determine true cash value, *the property must be assessed at its highest and best use.* The concept of highest and best use recognizes that the use to which a prospective buyer would put the property will influence the price that the buyer would be willing to pay for it. The concept is fundamental to the determination of true cash value. Highest and best use is defined as the most profitable and advantageous use the owner may make of the property even if the property is presently used for a different purpose or is vacant, so long as there is a

market demand for such use. The tribunal is required to make a determination of a subject property's highest and best use. [Cleaned up.]

The petitioner has the burden of proving the true-cash value of property. *Id*. at 520; MCL 205.737(3). Even if the petitioner does not meet its burden, the tribunal is required to make an independent determination of true cash value. "The tribunal may not automatically accept a respondent's assessment, but must make its own findings of fact and arrive at a legally supportable true cash value." *Jones & Laughlin Steel Corp v Warren*, 193 Mich App 348, 355; 483 NW2d 416 (1992).

Petitioner argues that the tribunal's decision in this case is "against the great weight of the evidence." Petitioner's reference to a "great weight" standard is misplaced. Instead, the pertinent inquiry is whether the tribunal's decision is supported by competent, material, and substantial evidence on the whole record. *Briggs Tax Serv*, 485 Mich at 75. In *Menard*, 315 Mich App at 520, this Court explained:

> Substantial evidence is evidence that a reasoning mind would accept as sufficient to support a conclusion. Substantial evidence must be more than a scintilla of evidence, although it may be substantially less than a preponderance of the evidence. Failure to base a decision on competent, material, and substantial evidence constitutes an error of law requiring reversal. The entire record, not just the portions that support the agency's findings, must be reviewed when evaluating the tribunal's final determination. Further, cursory rejection of evidence is also erroneous. [Cleaned up.]

Petitioner first argues that the tribunal did not make an independent determination of the real property's true-cash value, but simply accepted the methodology used by respondent. This argument is without merit because it ignores the tribunal's explanation of its reasons for rejecting petitioner's methodology and granting more weight to respondent's methodology. The tribunal explained that petitioner's appraisal was premised on the highest and best use of the property as industrial property, which was not a legally permissible use under the existing zoning classification. The tribunal further explained that petitioner did not address what would be involved in changing the zoning classification. In addition, the tribunal found that petitioner's sales approach methodology was based on comparable properties that included industrial buildings and shopping centers, which were not similar to the subject property.

Conversely, the tribunal found that respondent's valuation was based on sales of comparable "big box" properties, which were more similar to the subject property. The tribunal also explained why the sales approach was the more reliable method for determining true cash value in this case, given that the property was owner-occupied, not a leasehold, and that respondent's comparable properties replicated the key features of the subject property, including that they were formerly "big box" stores sold to second-generation owners. Contrary to petitioner's argument, the tribunal did not blindly accept respondent's methodology, but instead identified specific differences between petitioner's and respondent's respective valuation methodologies, explained how those differences related to the subject property, and explained the factors that persuaded it to give less weight to petitioner's methodology and more to respondent's to determine the true-cash value of the property.

-4-

Petitioner next argues that respondent's valuation methodology was not valid because it was not based on the Uniform Standards of Professional Appraisal Practice ("USPAP"). Specifically, petitioner argues that respondent's valuation disclosure "had an unduly limited scope of work, failed to critically examine the properties listed as 'comparable' and ultimately presented an appraisal which was not credible." Respondent's expert witness, Thurston, made clear at the hearing that he did not prepare an appraisal, but rather a valuation disclosure, which was different. Thurston admitted that he did not follow the USPAP standard regarding a walk-through of the property, but explained that he was not bound by those standards because he was not performing an appraisal. The tribunal agreed that the USPAP did not apply to respondent's valuation disclosure because it was not an appraisal. Because the USPAP only applies to appraisals, and the tribunal recognized that Thurston only prepared a valuation disclosure and not an appraisal, the tribunal did not err by failing to find that Thurston's failure to follow certain USPAP standards rendered his valuation methodology invalid.

Petitioner contends that respondent's valuation and the tribunal's ruling did not address "deferred maintenance of the Petitioner's parking lot, and the effect of the retention ordinance." Our review of the record reveals that there was no testimony offered at the hearing below regarding how these factors affected the property's value. Accordingly, petitioner has not demonstrated that the tribunal erred by failing to consider these items.

Next, petitioner argues that the tribunal erroneously qualified Thurston "as an expert in appraisal (but not valuation)." The record does not support this argument. At the hearing below, petitioner conceded that Thurston was qualified to testify as an expert with regard to assessing property, but argued that he was not qualified to testify regarding the valuation of property. The tribunal qualified Thurston as "an expert in assessing and valuation" and "[n]ot in appraisal." Petitioner's argument on this point is without merit.

Petitioner also argues that the tribunal made various errors of law. First, petitioner argues that the tribunal erred by ignoring the impact of the deed restriction on the property's value. Petitioner correctly points out that, in *Menard*, 315 Mich App at 523-526, this Court held that a deed restriction is a factor to be considered in determining the true-cash value of property under a sales-comparison analysis. In this case, however, the tribunal did not ignore the deed restriction that affected the subject property. Rather, it specifically addressed the restriction, as well as this Court's decision in *Menard*, but found that the restriction "had an insignificant effect on value." Because the tribunal was aware of and expressly considered the deed restriction, the tribunal did not commit an error of law with regard to the effect of the restriction. The more pertinent inquiry is whether the tribunal's finding that the deed restriction "had an insignificant effect on value" is supported by competent, material, and substantial evidence on the whole record.

Petitioner impliedly takes the position that, under *Menard*, the value of the property was *required* to be lowered because of the existence of the deed restriction. This is an incorrect reading of *Menard*, which only holds that parties and the tribunal must consider the impact of deed restrictions in determining the value of property. That is what occurred here. The tribunal considered the impact of the deed restriction, but concluded that it was insignificant to the property's value. This finding is supported by Thurston's testimony that the restriction was "very narrow" because it only prevented the property from being used as a home improvement or

hardware store, it did not otherwise make the property unsuitable for retail purposes, and there were still retail users or commercial property users that would find this building to have utility. In Thurston's opinion, this was a common type of restriction, which was "[n]ot very restrictive at all."

As for considering comparable properties that did not contain deed restrictions, that proved to be difficult for both parties. Few, if any, of the comparable properties had such restrictions. Thurston testified, however, that properties like the subject property that formerly contained "big box" stores were able to be used for other businesses that would not run afoul of the deed restrictions. The tribunal found that the deed restriction had an insignificant effect on the property's value. Given Thurston's testimony, this finding is supported by competent, material, and substantial evidence on the whole record.

Petitioner further argues that the tribunal should have given more weight to the fact that the property was being used as a wholesale warehouse. Petitioner argues that the property's use as a "warehouse" was a permissible nonconforming use under respondent's zoning classifications. Thurston testified, however, that while petitioner referred to its use of the property as a "warehouse," it was actually just another form of a retail business. In contrast, petitioner's expert believed that use of the property as a warehouse would be outside the existing zoning classification. Nonetheless, he seemed to acknowledge that respondent recognized petitioner's use of the property as a permitted use under the existing zoning classification. Even though petitioner's business is not open to the general public, that does not change the fact that the business qualifies as a form of retail business. The business petitioner operates on the property is not a traditional warehouse, where goods are simply stored. Accordingly, there is no basis for petitioner's claim that the present use of the property qualifies as a nonconforming use.

Petitioner also argues that the tribunal erred by failing to consider the impact of the closure of the nearby Northland Mall on the property's value. Tomlinson opined that the closure of the mall changed the nature of the surrounding area, which was formerly a popular retail destination. Tomlinson also claimed that online shopping affected retail businesses in the area. In contrast, respondent's expert opined that the closure of other stores in the area did not affect the uses for the subject property. The tribunal considered the impact of the closure of the Northland Mall, but agreed with Thurston that it did not have much impact on the subject property. The tribunal noted that the most similar comparable property was located within five miles of the subject property, and was therefore subject to the same economic influences from the closure of the Northland Mall as the subject property. Moreover, Thurston explained that the subject property's location along a busy roadway (Eight Mile Road) and near two freeways made it a prime site for a retailer or other business. In addition, another nearby property used for a "big box" store was successfully sold and repurposed, despite the mall's closure. This record evidence supports the tribunal's determination that the closure of the mall was not a significant factor in determining the true cash value of the property.

In addition to the prior claims, petitioner also sets forth a laundry list of other reasons why it believes the tribunal should not have accepted Thurston's valuation of the subject property. In particular, it identifies various alleged flaws in Thurston's testimony and analysis. We are not persuaded by petitioner's arguments that the tribunal's decision was not supported by competent, material, and substantial evidence.

-6-

According to petitioner, Thurston failed to inspect the property properly. Thurston testified that he did not perform an internal "inspection" of the property, but only briefly went inside; he explained that he could not inspect all of the comparable properties, so he did not want to bias his opinions if he knew more about the subject property. Even if Thurston could have conducted a more thorough inspection of the property, petitioner does not explain why the limited inspection that was conducted invalidates Thurston's conclusions and testimony, or what a more thorough inspection would have revealed. Therefore, this argument is without merit.

Petitioner also complains that Thurston did not consider the property's use as an industrial warehouse, but Thurston testified that he believed that such a use was not permitted under the existing zoning laws. Petitioner also seems to argue that Thurston should have treated the nearby roadways, traffic, and limited access points to the property as factors that negatively affected the property's value. According to Thurston, however, the property's location along a major roadway, with access to nearby freeways, actually enhanced its value as a business. It was within the province of the tribunal to find on the basis of Thurston's testimony that the property's location to nearby roadways, traffic, and freeways did not negatively affect the property's value.

Thurston incorporated USPAP standards in his valuation disclosure when they suited his needs, but, according to petitioner, he ignored other standards when they did not. As previously discussed, Thurston explained that he did not feel bound to follow USPAP standards because he was not performing an appraisal of the property. Thus, regardless of whether his methodology may have been consistent or inconsistent with certain USPAP standards, this did not preclude the tribunal from finding that his valuation testimony was otherwise credible and reliable.

Petitioner also complains that Thurston applied a double standard when he rejected valuation of the subject property for multi-tenant usage when one of his comparables included a multi-tenant configuration. Petitioner does not provide a citation to the record in support of this claim, but it appears to refer to testimony that the primary comparable on which Thurston relied involved a converted "big box" store that was being used for both self-storage units and a U-Haul business. Even though Thurston believed that multi-tenant properties were not appropriate to use as comparable properties because petitioner's property was owner-occupied, it is not apparent that the self-storage and U-Haul business were a true multi-tenant situation. Petitioner has not shown that Thurston's analysis, or the tribunal's decision, was invalid for this reason.

Petitioner also claims that Thurston improperly relied on an outdated property sale in performing his analysis and also relied on a property on which a structure was demolished after the property was sold. Thurston acknowledged those differences, which were factors for the tribunal to weigh in determining whether respondent's analysis reliably showed the true cash value of the property.

Finally, petitioner presents additional reasons why it believes that Thurston's opinion should not have been accepted, including his failure to apply an income approach, not documenting the subject property's improvements and floor plan, and not evaluating the neighborhood, market, vacancy rates, absorption, or number of entrances to the property. Simply pointing out these factors does not establish that the tribunal erred by accepting the valuation method and analysis offered by Thurston. Notably, petitioner does not explain how these factors affected the validity of Thurston's analysis of the property's value.

Petitioner has not demonstrated that the tribunal made an error of law or that its decision is not supported by competent, material, and substantial evidence on the whole record.

Affirmed. Having prevailed in full, respondent may tax costs under MCR 7.219(F).


/s/ Brock A. Swartzle
/s/ Jane E. Markey
/s/ James Robert Redford