*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

HOFFMAN MACHINERY CORP.,

Plaintiff-Appellee,

v

REID MACHINERY INC.,

Defendant-Appellant.

FOR PUBLICATION
December 16, 2025
9:00 AM

No. 368468
Ingham Circuit Court
LC No. 21-000515-CB

Before: SWARTZLE, P.J., and O'BRIEN and BAZZI, JJ.

O'BRIEN, J.

Defendant, Reid Machinery Inc. (RMI), appeals as of right the judgment entered after a bench trial that awarded plaintiff, Hoffman Machinery Corp. (HMC), $495,025.74 on HMC's claims of breach of bailment contract, common-law conversion, and statutory conversion, MCL 600.2919a. In this case, which involves the bailment of large machinery, RMI challenges the adequacy of the evidence to support HMC's claims. But because RMI, in essence, held the property hostage in order to extract money that was not owed, the claims are well supported. Further, because the award of treble damages under MCL 600.2919a is warranted, RMI's claims of error are without merit. We therefore affirm.

## I. BACKGROUND

Ed Reid owns defendant company, RMI, while Ralph Hoffman owns plaintiff company, HMC. RMI is a "rigging" company, which is a company that moves or loads heavy equipment. HMC is not in the rigging business; instead, HMC is in the business of purchasing and selling large, forging machinery. These machines can range anywhere from 10,000 pounds to 2.5-million pounds. HMC usually purchases these machines without knowing who it will resell the equipment to (and more importantly, where the purchaser will want the equipment). Consequently, when HMC acquires a machine, it usually tries to store it close to where it was purchased in order to keep its shipping costs down. Machines in HMC's inventory can exist for decades before they are resold. In 2004, HMC and RMI started participating in a joint venture. The joint venture involved both entities purchasing equipment and RMI supplying the rigging services. After selling the machines, the parties would split the proceeds.

This case involves a particular, large Ajax press.[1]  HMC owned the press, which had been stored in Cleveland, Ohio, for 16 years.  In 2006, after being informed that it could no longer be stored in Cleveland, HMC hired RMI to load the press, transport it to RMI's principal place of business in Lansing, Michigan, and unload it there.[2]  RMI agreed to store it outside on its property for free until HMC found a buyer for it.[3]

However, the relationship between HMC and RMI began to sour when RMI sold three machines from the joint venture while retaining HMC's proceeds.  HMC filed suit (*Hoffman I*) in 2020.  *Hoffman I* proceeded to mediation in April 2021.  The mediation led to a settlement offer of $325,000.  But when drafting the final settlement agreement, HMC's attorney inserted "paragraph 7," which added an extra $25,000 to the settlement amount, making it a total of $350,000.[4]  The insertion of this paragraph incensed Reid, and he told an employee, "Screw it, I'm going to charge them rent going back 14 years."

Around the time of July 2021, Reid was located in Louisville, Kentucky, working on a large job there.  He started working there starting sometime in June, and in July only returned to Michigan for six days (July 21 through July 26) for his daughter's wedding.  Despite Reid's inability to be in Michigan during this time, at Reid's direction, RMI sent an e-mail containing a letter to HMC on June 30, 2021, informing it of rent increases.  The letter notified HMC that in 30 days, starting on August 1, 2021, the rent for storing the Ajax press was going to be $15,000 per month.  Additionally, the rent that HMC had been paying for inside storage for three other presses it had on RMI's lot was increasing from $404.40 per month to $3,500 per month.  The letter closed:

> If you no longer wish to continue to store the presses at our location, please contact Matt at our office to obtain the rigging charges related to our removal of the presses on to your trucks.  As you know, we can also provide for the transportation of the presses using our trucks.  If you let Matt know where you want them to go, he can also provide you the cost quotes for that service as well.

---

[1] The press is called a "6,000-ton press."  But its actual weight is nearly 1,000,000 pounds, with 475,000 pounds for the frame and 500,000 pounds for the parts.

[2] Although RMI orally quoted to HMC that it would cost $48,000 to perform the work, the actual invoice was for $115,738, which HMC paid.  Further, because of the size of the press, a heavy duty railcar was needed to move it, and it took three to four months to locate such a railcar.

[3] Although Reid cursorily averred that he was only supposed to store the machine for two years for free, he admitted there was no such agreement.

[4] The dispute on this extra $25,000 arose because, according to Hoffman, he and Reid had agreed to *sell* their last jointly owned press and split the proceeds, but Reid only offered to pay half the *scrap* value, which was "substantially" less.

We look forward to continuing our storage service for you. If you have any questions, comments or concerns, please feel free to contact us by phone . . . or by email . . . .

Reid knew the $15,000 rent for the Ajax was unreasonable and "ridiculously high." In fact, he knew that the $15,000 amount had no relation to any actual market rate for rent; the $15,000 was derived by figuring out how much HMC would have paid RMI had it paid $1,000 per month for the last 14 years and spread that amount over the course of one year.[5]

One hour after receiving the e-mail, Hoffman replied, "Please give me the cost to load our (2) Weingarten and (1) National screw presses along with the 6000 Ajax press." Hoffman also contacted Jason Roughton from RJ Industrial Recycling about scrapping the Ajax and the three other presses.[6] The following day, July 1, 2021, Hoffman notified RMI that Roughton wanted to view the presses and was available to view the equipment later that afternoon. RMI never responded to Hoffman's requests, and Roughton, who had recently done work at RMI's yard, knew the on-site manager there and simply went to the yard unannounced.

Roughton was able to view the presses at RMI's yard. Roughton also talked with Reid, who was still in Kentucky. Roughton conveyed to Hoffman that, according to Reid, he wanted Hoffman to call him to "work out the rent on the Ajax press." Roughton also provided a price for him to cut the Ajax into "manageable chunks" but he did not know what the cost would be for RMI to load the equipment out. Hoffman was confused by Roughton's message from Reid because the "[r]ent is up to date."[7]

On July 6, 2021, Hoffman sent RMI another reply to the June 30, 2021 letter notifying of the rent increases. Hoffman asserted that the increase in storage rates was retaliatory for the *Hoffman I* lawsuit. Hoffman further formally rejected the proposed increases and stated:

> I intend to move the 3 presses from your facility prior to August 1, 2021. Also, as you are already aware from your conversation last week with Jason Roughton, I intend to have the 6000-ton press scrapped and removed from your facility prior to August 1, 2021. Hoffman Machinery Corp. is not in arrears on any current rent. If you contend that past due rent is owed, please contact me in writing immediately with a complete breakdown as to what you assert is owing and provide supporting documentation. In order to move my equipment as outlined above, I will need and

---

[5] $1,000 per month x 12 months x 14 years is $168,000. RMI then took that amount and divided it by 12 months to get $14,000 per month, which it then simply rounded up to $15,000.

[6] Roughton and his company, RJ Industrial Recycling, are in the business of scrap metal, recycling, processing, and demolition.

[7] About a week later, Roughton had another discussion with Reid, in which Reid mentioned that Hoffman owed money for back storage of the Ajax at a rate of $2,000 per month for the last 14 years or $400,000. Thus, Reid indicated that he would charge $400,000 to load the equipment out, and Roughton relayed that information to Hoffman.

expects [sic] access to your facility for my representatives in order to accomplish a timely removal.

Hoffman also noted that, even though he had requested quotes in his initial June 30 e-mail for RMI to load the presses, he has not heard any reply. Thus, Hoffman again requested a quote for the cost of loading the three presses and for "blocking" the Ajax on the railcar so it could be safely cut into scrap pieces and for loading those scrap pieces onto Roughton's trucks. Hoffman stressed that Roughton had availability the week of July 12, 2021, "so time is of the essence." Hoffman added that he would be getting competitive quotes from other companies "to ensure that reasonable market rates are being charged" and that those other companies will need access to RMI's yard to be able to inspect the presses.

On July 7, 2021, Hoffman sent two e-mails to RMI: one requesting that Joe Santamaria from Phoenix Machinery Movers[8] be allowed access to view the presses, and one requesting that Tim Powser from International Industrial Contractors Corporation be allowed access. Later that day, Brenda Benton from RMI e-mailed Hoffman back, stating the following:

> Mr. Reid is still working out of state and likely will not be back until next Wednesday. However, he said that you would know that any rigging out of our business location would be done by Reid Machinery Inc as you have acknowledged in an earlier email.

> As soon as possible, Mr. Reid will provide you a quote(s) for the work and we will have those emailed to you so that you can run them by your other people.

> At this point, just not to waste anyone's time, Mr. Reid is not willing to allow any other riggers on his property to quote the jobs. If there is a problem with the quotes, we will revisit this issue of your people coming upon the property.

> Mr. Reid wanted you to know, that his quote will be reasonable and within Industry Standards for this type of work.

On July 9, 2021, Hoffman issued a letter to RMI, stating:

> Hoffman Machinery has never indicated or acknowledged in an e-mail or otherwise that Reid Machinery would do all rigging out at your business location. We have obtained quotes from other riggers in the past. I hope Ed doesn't really

---

[8] Hoffman had previously contacted Santamaria about getting a quote. On July 2, 2021, Santamaria estimated that the cost to "[l]oad, deliver, unload, and set in storage three (3) Presses [the three presses stored inside at RMI] and one (1) load of parts from a facility in Lansing" to Phoenix's facility in Shelby Township, Michigan, was $12,560. Notably, this quote did not contemplate the large Ajax frame, only its parts. That is because Hoffman's plan was to have RJ Industrial scrap (and transport) that press. Later, Hoffman asked Santamaria to quote (1) removing the Ajax frame from the railcar, after which it would be cut into six pieces, and (2) then loading the pieces onto trucks.

think that Reid Machinery has the exclusive right to rig the Hoffman Machinery Equipment for removal, particularly when the absurd and retaliatory storage rate increases ($404.40 to $18,500 per month) that Reid Machinery recently announced as being effective August 1 is what is forcing me to move my equipment quickly. That increase in the storage rate has been rejected, and Hoffman Machinery has the right to remove our equipment without Reid Machinery creating impediments.

If it is really Ed's intent to avoid wasting anyone's time[,] perhaps[] he could avoid wasting my time. He or Matthew should promptly respond to my requests for quotations from Reid Machinery now since both he and Matthew are quite familiar with the equipment in question. Ed being out of town should not delay the quotes.

Obviously, we will not know if there is a problem with the Reid Machinery quotes until they are delivered to us. Therefore, we want to obtain quotes from other riggers. Accordingly, we would appreciate it if Reid Machinery provides access to Joe Santamaria on July 12th or 13th and provide access to Tim Prowser [sic] from Industrial International Contractors as we previously requested in the e-mails sent to Ed and Matthew on the afternoon of July 7. Since it is probably too late to accommodate Tim Prowser [sic] at the times initially requested, please give me dates next week that he can inspect my presses.

It is not appropriate for Reid Machinery to force us to remove the presses by dramatically increasing the charges and then stall and create obstacles to our removal of the presses. If the time has come for Hoffman Machinery and Reid Machinery to part ways and clearly it has, then let's just move forward and get it done as quickly and as economically as possible. The sooner we have quotes from Reid Machinery and the other riggers of our choice, the sooner we can hire someone and move forward with removing the presses before August 1. If the Reid quotes are the best quotes, Reid Machinery will likely get the jobs.

On July 12, 2021, Hoffman sent a follow-up e-mail, noting that although initially requested on June 30, 2021, he was still waiting for RMI's quotes for performing the rigging on the presses. Hoffman also wanted to confirm that he could send in his other contractors to the site to view the presses, so they could quote loading and trucking the equipment. Around this time, Reid called Powser and told him that no one was allowed on the site without authorization due to the disagreement between him and Hoffman and that no work would be allowed to occur on the premises until the dispute was resolved.

With still having received no response from RMI, Hoffman sent another e-mail on July 14, 2021, explaining that Santamaria from Phoenix Machinery would like to visit the site the following day. Brenda from RMI replied less than an hour later, asking if Santamaria could call Reid on his cell phone. Santamaria, who had an established, good, working relationship with RMI, did call Reid, and set a date of July 21, 2021, to visit the site, which coincided with when Reid would return (briefly) to Michigan from his offsite work. During this visit with Reid, Santamaria said that he decided that he would not load any parts. Santamaria cited the customary practice of

allowing riggers to perform rigging work when the equipment was on their property.[9]  Santamaria then asked Reid for a quote to load the equipment onto Phoenix's trucks.  Reid later told him that it would be $16,800 for RMI to load the three presses and $165,000 for RMI to load the Ajax parts. When Santamaria passed those costs along to Hoffman on July 26, 2021, Santamaria added, "don't kill the messenger."  Hoffman was upset with those numbers and thought the $165,000 was "insane."  During Santamaria's conversation with Hoffman, Santamaria indicated that he no longer wanted to be involved with the job.[10]

Hoffman testified that RMI's oral and "insane" quote on July 26, 2021, was "the straw that broke the camel's back," and he decided to file suit on behalf of HMC.  That complaint was filed on August 6, 2021, and pertinently alleged counts of Breach of Contract for Bailment, Conversion, and Statutory Conversion under MCL 600.2919a.[11]

In September 2021, while this case was pending, the parties formally settled *Hoffman I*, in which RMI agreed to pay the "extra" $25,000 to HMC for a total of $350,000.  Additionally, even after filing suit and having never received a written quote from RMI, Hoffman sent another request to RMI, requesting a formal quote to load the machinery.  RMI never responded to that request as well, but in October 2021, RMI's attorney provided a written quote, which matched the amounts ($16,800 and $165,000) Santamaria previously relayed.

RMI moved for summary disposition of HMC's claims under MCR 2.116(C)(8) and (10). RMI argued that the claims failed because the necessary demand for possession by HMC never occurred and no refusal by RMI occurred.  RMI also argued that dismissal of the tort claims was proper because no action in tort could be maintained when the legal duty upon which the claim is based was created by a contractual relationship.  HMC responded and moved for summary disposition under MCR 2.116(I)(2).  The trial court denied both parties' request for summary disposition.  The court noted that Reid's comment that no other rigger was allowed on the property, coupled with what one could conclude was Reid's exorbitant quotes, placed unreasonable conditions on the retrieval of HMC's equipment.  The court determined that these questions were for the trier of fact to resolve.  Regarding RMI's argument about HMC not being able to sustain its tort claims because of the parties' underlying contractual relationship, the trial court ruled that

---

[9] This practice was called many things during trial, including "a rule of thumb," "the rigger rule," and a "common courtesy."

[10] Hoffman testified that Santamaria said that the job—even just transporting the equipment—was not worth losing his relationship with RMI.  Santamaria, on the other hand, testified that he only declined to do any part of the job because of how Hoffman "ranted" when told of Reid's quotes for loading the equipment.  The trial court did not find Santamaria credible on this topic.  The court instead found that "it was Mr. Reid who killed Santamaria's desire for the job and not Mr. Hoffman's reaction to the quote."

[11] The complaint also alleged counts of (1) Claim and Delivery and (2) Trespass to Chattels, but according to RMI, plaintiff voluntarily dismissed those counts.  Also, RMI filed a counterclaim, in which it sought to recover back rent on the Ajax press, but those claims were dismissed in summary-disposition proceedings.  The dismissal of these claims is not before this Court.

the claims were viable because RMI was purportedly violating a separate and distinct duty from any contractual duty to not convert another's property.[12]

Thereafter, a four-day bench trial was held. In its findings of fact and conclusions of law, the trial court found in favor of HMC. The court ruled that HMC's position was supported by overwhelming evidence, showing that Hoffman was diligent in his attempts to remove the Ajax press. The court found that Reid, in multiple ways, placed obstacles in Hoffman's way, impeding him from taking back the machinery. First, "Mr. Reid prevented any work from being done until he provided a quote and he never provided a quote." The trial court recognized that the only quotes that were given before the filing of the complaint were oral quotes, with neither one actually being given to Hoffman. Additionally, these quotes ($165,000 provided to Santamaria and $400,000 provided to Roughton) were demonstrably unreasonable. The court rejected RMI's argument that Hoffman could have simply accepted Roughton's quote, which he had in hand by July 12, 2021. At that time, Roughton understood that Reid was prohibiting him from starting any work until the issue of "past rent" was addressed. The court noted, "Reid's refusal to allow work to be done until his own manufactured dispute about back rent was resolved was but another obstacle that he placed in Mr. Hoffman's way." The court identified another obstacle: Hoffman's attempt to obtain a quote from Santamaria. The court found that because Santamaria was willing to remove the three presses before meeting Reid, it was Reid—after Reid and Santamaria met—who dissuaded him from doing any of the work. The court also found that the initial June 30, 2021 rent-increase letter evidenced an obstructive effort on RMI's part. With the parties knowing that it previously took three to four months to coordinate the moving of the Ajax press from Cleveland, the 30-day window to remove the press or else be subject to the astounding $15,000 per month rent put Hoffman and HMC "in an impossible position."

The trial court acknowledged that for conversion, there must have been a demand for return of the property unless a demand would have been futile. The court found that Hoffman requested a quote several times, including immediately after receiving the rent-increase letter, which satisfied any demand requirement. The trial court also found that HMC was entitled to damages under the claim for statutory conversion because RMI converted the Ajax press for its own use. Although RMI did not physically use the Ajax press, it held the property "hostage," which the trial court determined was sufficient to satisfy this requirement. The trial court characterized Reid's actions as "willfully wrong" and "malicious," which warranted an award of treble damages, attorney fees, and costs.

On October 18, 2023, the trial court entered a judgment in the amount of $495,025.74[13] in HMC's favor, and RMI's appeal followed.

---

[12] RMI filed an application for leave to appeal the trial court's decision, but this Court denied the application "for failure to persuade the Court of the need for immediate appellate review." *Hoffman Machinery Corp v Reid Machinery Inc*, unpublished order of the Court of Appeals, entered May 19, 2023 (Docket No. 365869).

[13] The $495,025.74 consisted of $283,100 in damages, $174,188.30 in attorney fees, $4,063.29 in costs, and $33,674.15 in prejudgment interest.

## II. SUMMARY DISPOSITION

RMI argues that the trial court erred when it denied its motion for summary disposition on HMC's conversion claims. We disagree.

We review a trial court's decision to grant or deny a motion for summary disposition de novo. *PNC Nat'l Bank Ass'n v Dep't of Treasury*, 285 Mich App 504, 505; 778 NW2d 282 (2009). Although the trial court denied RMI's motion for summary disposition under both MCR 2.116(C)(8) (failure to state a claim) and (10) (no genuine issue of material fact), RMI on appeal only challenges the denial of the motion with respect to MCR 2.116(C)(10). A motion brought under MCR 2.116(C)(10) tests the factual support for the claim. *Spiek v Dep't of Transp*, 456 Mich 331, 337; 572 NW2d 201 (1998). "In evaluating such a motion, a court considers the entire record in the light most favorable to the party opposing the motion, including affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties." *Corley v Detroit Bd of Ed*, 470 Mich 274, 278; 681 NW2d 342 (2004). The motion should be granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Kisiel v Holz*, 272 Mich App 168, 170; 725 NW2d 67 (2006).

"Under the common law, conversion is any distinct act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein." *Aroma Wines & Equip, Inc v Columbian Distribution Servs, Inc*, 497 Mich 337, 346; 871 NW2d 136 (2015) (*Aroma Wines II*) (quotation marks and citations omitted), reh den 498 Mich 877 (2015). "[I]n addition to the common-law elements for conversion, a plaintiff claiming statutory conversion must show that the conversion was for the defendant's 'own use.' " *Magley v M & W Inc*, 325 Mich App 307, 314 n 3; 926 NW2d 1 (2018) (citation omitted). This "own use" requirement requires proof that "the defendant employed the converted property for some purpose personal to the defendant's interests, even if that purpose is not the object's ordinarily intended purpose." *Aroma Wines II*, 497 Mich at 358-359.

RMI avers that in order for HMC to prevail on its conversion claims, HMC *must* establish that it demanded return of the property and that RMI refused the demand. "The bailor is entitled to possession of the bailed chattels when [1] the purpose of the bailment has been fulfilled, [2] when the stipulated bailment time has terminated and the bailor has made a demand for the goods, [3] when no time for keeping has been specified and the bailor has made a demand for return, or [4] when there has been a wrongful termination of the bailment by the bailee." 3 Mich Civ Jur, Bailments, § 8. Only the third aspect is applicable in the instant case. However, demand is not necessary in all instances. Notably, demand is not necessary when the defendant's actions already amount to a conversion. *Gum v Fitzgerald*, 80 Mich App 234, 238; 262 NW2d 924 (1977); see also *Hoffenblum v Hoffenblum*, 308 Mich App 102, 115; 863 NW2d 352 (2014) ("A demand is unnecessary . . . where the property has been wrongfully appropriated by the defendant for his own use and benefit.") (citation omitted).

As RMI acknowledges, there are no particular words that must be made for a proper demand; instead, the language must make known to the bailee that the bailor desires possession of the property. 6 Mich Civ Jur, Conversion, § 35; see also *Belcher v Ranney*, 211 Mich 438, 442; 179 NW 36 (1920). Assuming a demand was necessary, there was sufficient evidence to allow a fact-finder to find that such a demand was made by HMC. As noted earlier, in the June 30, 2021

rent-increase letter, RMI indicated to HMC that "[i]f you no longer wish to continue to store the presses at our location," HMC was to "contact Matt at our office to obtain the rigging charges related to our removal of the presses on to your trucks." Hoffman immediately replied to the e-mail containing this letter, and requested quotes to load the presses. Because RMI established that in order to remove the presses, HMC had to first request quotes for loading the presses, a fact-finder could easily conclude that HMC making that request was analogous to indicating that it wanted its presses removed from RMI's possession.

Additionally, in his letter from July 6, 2021, Hoffman explicitly stated: "I intend to move the 3 presses from your facility prior to August 1, 2021. Also, as you are already aware from your conversation last week with Jason Roughton, I intend to have the 6000-ton press scrapped and removed from your facility prior to August 1, 2021." Hoffman reminded RMI that his earlier request for RMI to quote the loading of the presses went unanswered and again requested the quotes to facilitate the removal of the property. Hoffman noted that "[a] prompt response to my request for your quotes will assist in the timely removal of the equipment prior to August 1, 2021." Importantly, the property involved in this case is not a simple toolbox or other easily transportable good. These presses are massive and require special loading and transportation. They are located on RMI's premises, and their removal necessarily *requires* RMI's cooperation. As such, Hoffman's July 6 communication was demanding that RMI facilitate the equipment's removal from RMI's premises, which, under the circumstances, could allow a fact-finder to conclude that HMC's request was a sufficient demand for possession.

Therefore, RMI's argument that it was entitled to summary disposition on account of a lack of demand on HMC's part is belied by the record.

RMI next asserts that even if a demand was made, there was never any unqualified refusal by it. In addition to usually needing to prove that a demand was made, a plaintiff also needs to show that the right to possession was refused. *Gum*, 80 Mich App at 239. The next day, RMI explicitly stated that "Mr. Reid is not willing to allow any other riggers on his property to quote the jobs." In that letter, RMI asserted that there also was no need for other riggers to quote the job because it will provide a quote that will be "reasonable and within Industry Standards." However, no such quote was ever provided. First, before this suit was filed, RMI never provided *any* quote to HMC. Second, the quotes that were given orally to HMC's contractors were anything but "reasonable." Reid told Roughton that he would charge $400,000 for RMI to load the Ajax items. In that conversation, Reid admitted that the cost was not related to the actual work of loading the equipment but rather was derived by calculating $2,000 per motion back rent for the Ajax for the last 14 years. Reid also told Santamaria that he would charge $165,000 to load the Ajax parts. Importantly, in his deposition, Reid also admitted that the $165,000 "meant the same thing" as $168,000, which correlated to "back rent" of $1,000 per month for 14 years.

In sum, RMI's explicit refusal to allow others to come on the property to quote the removal of the equipment, coupled with RMI's failure to provide a quote of its own to remove the equipment, is sufficient to allow a fact-finder to conclude that RMI's actions constituted a "refusal" to relinquish the property. To the extent that RMI's "quotes" to HMC's contractors qualify as quotes, the evidence was sufficient to show that those quotes were not within "industry standard" and were grossly inflated, which allowed a fact-finder to consider them as de facto refusals to allow the equipment's retrieval.

RMI next argues that HMC's tort claims are barred because any action necessarily lies in contract. RMI avers that our Supreme Court held in *Hart v Ludwig*, 347 Mich 559; 79 NW2d 895 (1956), that when there is a dispute between contracting parties, the contract and its terms are relevant and the action lies in contract, not tort. RMI misrepresents *Hart*'s holding.

Traditionally, "there must be some active negligence or misfeasance to support a tort." *Id*. at 563. While "[a]cknowledging that the distinction between misfeasance and nonfeasance is often difficult to discern, the [*Hart*] Court explained that the fundamental principle separating the causes of action is the concept of duty." *Rinaldo's Constr Corp v Mich Bell Tel Co*, 454 Mich 65, 83; 559 NW2d 647 (1997); see also *Hart*, 347 Mich at 565. The Court recognized that in each situation where a tort action would lie, the "action would lie without having recourse to the contract itself." *Hart*, 347 Mich at 565. Quite simply, "the threshold inquiry is whether the plaintiff alleges violation of a legal duty separate and distinct from the contractual obligation." *Rinaldo's*, 454 Mich at 84; see also *Hart*, 347 Mich at 563 ("There must be some breach of duty distinct from breach of contract.").

RMI in its brief on appeal fails to put forth any cogent argument as to why it was entitled to summary disposition on this contract-tort ground. RMI's primary argument on appeal is that the trial court improperly relied on *Fultz v Union-Commerce Assoc*, 470 Mich 460, 467; 683 NW2d 587 (2004), and *Loweke v Ann Arbor Ceiling & Partition Co, LLC*, 489 Mich 157, 170; 809 NW2d 553 (2011). RMI correctly notes that both *Fultz* and *Loweke* address when a contracting party owes a duty to a third-party, i.e., a party who was not a party to the contract. *Loweke*, 489 Mich at 162-163; *Fultz*, 470 Mich at 463-464. But *Fultz* and *Loweke* merely incorporated the principles of *Hart*. *Loweke*, 489 Mich at 165-171; *Fultz*, 470 Mich at 465-466. Thus, to the extent the trial court erred by relying on *Fultz* and *Loweke* because those cases address duties owed to noncontracting parties, the error is harmless because the underlying principles in those cases are the same as those expressed in *Hart*, which deals solely with contracting parties.

Additionally, in its brief on appeal, RMI's argument on why *Hart* shows it should have prevailed is as follows:

> [T]he Trial Court erred in failing to apply *Hart*, which holds that in disputes between contracting parties (e.g., RMI and HMC): (1) the contract and its terms are very much relevant; <u>and</u> (2) the action lies in contract, not in tort. Accordingly, given the relevant facts and law, summary disposition should have been granted below in favor of RMI.

As already discussed, RMI misconstrues *Hart*'s holding. *Hart* does not hold that actions between contracting parties always lie in contract. Instead, an action in tort can be maintained if there is a distinct and separate duty owed to the other party. RMI does not explain how the trial court's ruling—that RMI had a legal and separate duty to not convert HMC's property—was erroneous. Therefore, RMI has failed to demonstrate how it is entitled to relief from the trial court's summary-disposition ruling. See *Menard, Inc v City of Escanaba*, 315 Mich App 512, 521 n 3; 891 NW2d 1 (2016) (stating that the appellant on appeal "has the burden to demonstrate that the lower court erred as governed by the relevant standard of review"). In any event, it is clear that RMI had a separate and distinct legal duty under the common law to not exercise dominion and control over the Ajax equipment that was inconsistent with HMC's right to possession.

-10-

RMI argues that the trial court erred when it found by a preponderance of the evidence that it was liable for conversion and breach of contract. We disagree.

Following a bench trial, this Court reviews a trial court's factual findings for clear error and its conclusions of law de novo. *Glen Lake-Crystal River Watershed Riparians v Glen Lake Ass'n*, 264 Mich App 523, 531; 695 NW2d 508 (2004). A finding is clearly erroneous when the reviewing court is left with a definite and firm conviction that a mistake has been made. *Alan Custom Homes, Inc v Krol*, 256 Mich App 505, 512; 667 NW2d 379 (2003).

RMI first incorporates its arguments it made with respect to the summary-disposition issue, and we reject those arguments for the same reasons provided earlier.

RMI also avers that the trial court's determination that RMI is liable for conversion should not stand because of five particular pieces of evidence: (1) Hoffman made no effort to call or write Reid after July 14, 2023; (2) Hoffman did not provide Reid with a copy of the quotes he received from the other contractors; (3) after receiving those quotes, Hoffman never demanded that Reid allow the contractors to perform their work; (4) Reid granted access to all three of Hoffman's contractors to inspect the property; and (5) had Reid been asked, he would have allowed the contractors to remove the equipment. After recounting these facts, RMI's argument for reversal consists of the following, "For these reasons, the Trial Court erred when it concluded that HMC proved its conversion claims, by a preponderance of the evidence, at trial." We deem this aspect of the issue abandoned. RMI utterly fails to explain how these five facts affect any analysis regarding conversion. Importantly, RMI does not challenge any particular factual finding the trial court made. "A party may not merely announce a position and leave it to this Court to discover and rationalize the basis for the claim." *American Transmission, Inc v Channel 7 of Detroit, Inc*, 239 Mich App 695, 705; 609 NW2d 607 (2000).

Related to the statutory-conversion claim, RMI next argues that the trial court erred when it found the instant case analogous to *Aroma Wines II*. In *Aroma Wines II*, the plaintiff rented a climate-controlled warehouse space from the defendant to maintain wine at a specified temperature. *Id*. at 341. After the plaintiff fell behind on the rent owed to the defendant, the defendant would not permit the plaintiff to pick up or ship any more wine until the past due invoices were paid. *Id*. The defendant released a small portion of the wine in exchange for a $1,000 payment. During this dispute, and contrary to the terms of the contract, the defendant moved the wine from the climate-controlled space into an uncontrolled environment. *Id*. The plaintiff claimed that the temperature changes destroyed the wine's salability, and it filed suit, alleging breach of contract, violation of the Uniform Commercial Code, common-law conversion, and statutory conversion. This Court reversed the trial court's grant of a directed verdict in the defendant's favor on the statutory-conversion count, stating:

> If a jury believed the evidence showing that [the] defendant moved [the] plaintiff's wine for its own purposes—whether it be to sell the space to other customers or complete a construction project—*or that it used the wine as leverage against* [*the*] *plaintiff*, it could have determined that [the] defendant converted the wine to its own use. [*Aroma Wines & Equip, Inc v Columbian Dist Servs, Inc*, 303 Mich App

441, 449; 844 NW2d 727 (2013) (*Aroma Wines I*) (emphasis added), aff'd 497 Mich 337 (2015)

Our Supreme Court agreed with this Court's definition of "use" and held that someone alleging conversion to the defendant's "own use" under the statutory provision of MCL 600.2919a(1)(a) must show that "the defendant employed the converted property for some purpose personal to the defendant's interests, even if that purpose is not the object's ordinarily intended purpose." *Aroma Wines II*, 497 Mich at 358-359.

The trial court in the instant case, while relying on *Aroma Wines II*, found that Reid put the Ajax equipment to his own use. The trial court did not err. Like the defendant in *Aroma Wines II*, RMI here converted the Ajax equipment for its own use by using it as leverage against HMC. Contrary to RMI's assertion, *Aroma Wines II* does not require any affirmative or physical acts be done with or to the property for it to be converted to a defendant's "own use." As this Court explained, simply using property as leverage is sufficient. *Aroma Wines I*, 303 Mich App at 449. While the *Aroma Wines I* Court recognized that the defendant did move the property, that was not the dispositive factor. The main point is that the defendant was *using* the property as leverage, *for its own personal use*. The Supreme Court's further definition reinforces this: property is converted to a defendant's own use when the defendant employs the converted property for some purpose personal to the defendant's interests, even if that purpose is not the object's ordinarily intended purpose. *Aroma Wines II*, 497 Mich at 358-359. The Supreme Court did not engraft a "moving" or physical component in its definition. As such, because the evidence overwhelmingly indicates that RMI used the Ajax equipment for its own use, e.g., used as leverage to extract money that was not owed by HMC, the trial court did not err in relying on *Aroma Wines II* and ruling that RMI was liable for statutory conversion.

## IV. AWARD OF TREBLE DAMAGES FOR STATUTORY CONVERSION CLAIM

RMI argues that the trial court abused its discretion when it awarded HMC treble damages, costs, and attorney fees pursuant to MCL 600.2919a. We disagree.

MCL 600.2919a(1) provides, in pertinent part, the following:

(1) A person damaged as a result of either or both of the following *may recover* 3 times the amount of actual damages sustained, plus costs and reasonable attorney fees:

(a) Another person's stealing or embezzling property or converting property to the other person's own use. [Emphasis added.]

## A. DISCRETIONARY NATURE OF DAMAGES UNDER MCL 600.2919a

In response to RMI's argument, HMC contends that the award of treble damages, costs, and attorney fees under MCL 600.2919a is mandatory. We review issues of statutory interpretation de novo. *Pobursky v Gee*, 249 Mich App 44, 45; 640 NW2d 597 (2001).

HMC acknowledges that "may" used in statutory language typically refers to discretionary actions. See *Port Huron v Amoco Oil Co, Inc*, 229 Mich App 616, 631; 583 NW2d 215 (1998). However, HMC notes that the statute provides that "[a] person damaged . . . may recover," thereby placing the discretionary act with the "person damaged," not the trial court. In other words, HMC contends that it is within the discretion of the plaintiff in a statutory-conversion case to make a claim for treble damages and that the trial court has no discretion to deny such damages if that party is successful. HMC relies on a recent Supreme Court case, *James Twp v Rice*, 509 Mich 363; 984 NW2d 71 (2022), which interpreted a similar damages provision in the Right to Farm Act, MCL 286.471 *et seq*. MCL 286.473b of that act states:

> In any nuisance action brought in which a farm or farm operation is alleged to be a nuisance, if the defendant farm or farm operation prevails, the farm or farm operation *may recover* from the plaintiff the actual amount of costs and expenses determined by the court to have been reasonably incurred by the farm operation in connection with the defense of the action, together with reasonable and actual attorney fees. [Emphasis added.]

The Supreme Court ruled that the use of the discretionary term "may" "does not end the inquiry because it is necessary to ascertain *to whom the statute gives that discretion*." *James Twp*, 509 Mich at 372 (emphasis added). The Court recognized that the statute does not say that the court "may award" costs but instead states that the prevailing farm or farm operation "may recover" them. *Id*. Consequently, the Court held that the discretionary action lies with the farm or farm operation and not the trial court. *Id*. at 375. In other words, "upon request by a prevailing farm or farm operation, an award of costs, expenses, and fees under MCL 286.473b is *mandatory*, not discretionary." *Id*. (emphasis added).

The damages provisions in the conversion statute and the Right to Farm Act are quite similar. Under MCL 600.2919a(1), "A person damaged as a result of either or both of the following *may recover* 3 times the amount of actual damages sustained, plus costs and reasonable attorney fees." (Emphasis added.) Likewise, in the Right to Farm Act, "the farm or farm operation *may recover* from the plaintiff the actual amount of costs and expenses determined by the court." (Emphasis added.) In both instances, the discretionary conduct is being placed with the prevailing party and not the trial court. Therefore, we agree with HMC's view that a proper interpretation of MCL 600.2919a(1) shows that it does not imbue a trial court with discretion to deny treble damages, costs, and attorney fees to a party who prevails on a statutory-conversion claim.

Be that as it may, we are compelled to rule to the contrary due to binding precedent. In *Aroma Wines I*, 303 Mich App at 449-450, this Court ruled:

> MCL 600.2919a(1) provides that a person damaged under the statute "may recover 3 times the amount of actual damages sustained, plus costs and reasonable attorney fees." (Emphasis added.) The term "may" is permissive and indicates discretionary activity. *Haring Charter Twp v Cadillac*, 290 Mich App 728, 749;

-13-

811 NW2d 74 (2010). Thus, under the language in MCL 600.2912a(1) [sic[14]], treble damages and attorney fees are discretionary. Accordingly, whether to award treble damages is a question for the trier of fact, and we cannot simply order treble damages upon a finding of conversion.

This Court also cited two unpublished cases that came to the same conclusion. See *Aroma Wines I*, 303 Mich App at 450, citing *LMT Corp v Colonel, LLC*, unpublished per curiam opinion of the Court of Appeals, issued April 19, 2011 (Docket No. 294063); *Poly Bond, Inc v Jen-Tech Corp*, unpublished per curiam opinion of the Court of Appeals, issued July 27, 2010 (Docket No. 290429).[15] But both of those cases did not examine to whom the discretion is afforded; they merely recognized that the word "may" denoted discretion and, without further analysis, summarily concluded that the discretion lies with the trial court. *LMT Corp*, unpub op at 3; *Poly-Bond*, unpub op at 7. It is this type of curtailed analysis that the Supreme Court expressly cautioned against. *James Twp*, 509 Mich at 372. Accordingly, these unpublished cases are not persuasive.

Despite our determination that *Aroma Wines I* was incorrectly decided on this issue, we are nonetheless bound to follow that decision. MCR 7.215(J)(1). Therefore, because we are compelled to follow *Aroma Wines I*, we hold that the award of damages under MCL 600.2919a falls under the discretion of the trial court.[16]

## B. THE TRIAL COURT'S DECISION

Next, we address whether the trial court abused its discretion by awarding treble damages, costs, and attorney fees under MCL 600.2919a. Notably, the trial court treated MCL 600.2919a as giving the court discretion to award the statutory damages. The court stated:

> The conversion statute is punitive in nature and allows a plaintiff to recover three times the amount of its actual damages, plus costs and attorney fees. Punitive damages are well warranted here in that Mr. Reid concocted this entire scheme because he was "really pissed" (about a settlement he agreed to) and said "screw it, I'm going to charge rent for 14 years" (for an arrangement that was agreed would involve no cost to Mr. Hoffman). His subsequent obstinance in allowing the Ajax to be removed is at least willfully wrong and in this Court's view it was malicious. Plaintiff is entitled to treble damages, which in this case is $250,800.

---

[14] The Court's reference to MCL 600.2912a(1) is an obvious clerical error. That provision addresses the burden of proof and the applicable standard of care in malpractice actions, which is wholly unrelated to the conversion issue in *Aroma Wines I*.

[15] Unpublished opinions are not precedentially binding, but they can be considered for their persuasive value. *Paris Meadows, LLC v City of Kentwood*, 287 Mich App 136, 145 n 3; 783 NW2d 133 (2010).

[16] By court rule, our disagreement with *Aroma Wines I* does not necessitate a poll for the convening of a conflict panel under MCR 7.215(J)(2) because, as discussed herein, our disagreement is not outcome-determinative.

-14-

Notably, RMI on appeal does not expressly challenge any of the above findings by the trial court.  Instead, RMI contends that "RMI worked in concert with HMC by allowing its contractors to inspect the yard and, in turn, prepare quotes for the loading/moving of the Ajax."  RMI conveniently omits that, as the trial court properly found, this entire scheme was concocted by Reid to, in essence, hold the property hostage in an attempt to extract money (that was not owed) for a perceived wrong in relation to an unrelated settlement.  Further, RMI repeatedly ignored HMC's requests to have RMI quote the loading of the equipment, RMI flat-out informed HMC and its contractors that no work would be allowed to occur until the manufactured "rent dispute" was resolved, and RMI gave HMC's contractors exorbitant quotes for RMI to load the equipment itself.  The trial court did not clearly err by finding that Reid's actions on behalf of RMI was "willfully wrong" and "malicious."  And because RMI's actions were so egregious, the trial court did not abuse its discretion when it awarded HMC treble damages, costs, and attorney fees under MCL 600.2919a.

## V.  BENCH TRIAL—BREACH-OF-CONTRACT CLAIM

RMI argues that the trial court erred when it determined after the bench trial that RMI breached its bailment contract with HMC.  We disagree.

To prove a claim of breach of contract, a plaintiff must show that "(1) there was a contract, (2) the other party breached the contract, and (3) the breach resulted in damages to the party claiming the breach."  *Bank of America, NA v First American Title Ins Co*, 499 Mich 74, 100; 878 NW2d 816 (2016).  RMI asserts that it, as a bailee, did not breach any duty owed to HMC because it safely stored the Ajax equipment for nearly 15 years and when it was time for the parties to part ways, RMI "cooperated" with HMC.  As previously discussed, the trial court's implicit finding to the contrary is not clearly erroneous.  Indeed, the record clearly shows that RMI's behavior was anything but "cooperative" during the process of HMC attempting to get its equipment removed.  RMI lastly contends that HMC could not prove its breach-of-contract claim because there was no demand for the equipment.  Assuming arguendo that a demand was necessary in the context of a breach of a bailment contract, as explained in Part II of this opinion, HMC sufficiently demanded the return of the property.

Affirmed.  HMC, as the prevailing party, may tax costs pursuant to MCR 7.219(A).


/s/ Colleen A. O'Brien
/s/ Brock A. Swartzle
/s/ Mariam S. Bazzi

-15-